## William Hobart v. The City of Detroit.

*City Charter: Contract: Lowest bidder: Patented article.* The fact that an article is patented does not necessarily prevent any person but the patentee from contracting to supply it; others may do so, taking the risk of being able to obtain the patentee's license.

Therefore, where a city charter provides that no contracts shall be made by the city, except with the lowest bidder, after advertisement of proposals, it does not prevent the city from contracting for a patented article, such as the Nicholson Pavement, although, in point of fact, the only bidder was the patentee, who held a monopoly of the article.

*Heard July 8th. Decided July 13th.*

Appeal in Chancery from Wayne Circuit.

The bill in this case was filed against the City of Detroit, E. N. Lacroix, its special collector, and Smith, Cook & Co., a firm of paving contractors, to enjoin the collection of a paving tax upon the premises of complainant, situate on Woodbridge street, in the City of Detroit, assessed in 1867, to defray the cost of paving in front of said lot with the "Nicholson Pavement," so called.

HOBART v. THE CITY OF DETROIT.

The bill charges that the "Nicholson Pavement" is a patented method of paving, and that Smith, Cook & Co. are the exclusive owners of the patent right for the city of Detroit, and that no one else can lawfully construct said pavement in said city; that in bidding for the contract to do said paving, there could be no lawful competition under the city charter, and that, in fact, they were the only bidders for the contract; and that, on such a bid, the contract was let to them, and the tax assessed to pay for the contract so made.

The complainant insists that, under the charter of the city, it is not lawful to make any contract with a party for work, etc., for which the party holds an exclusive patent, and with whom there is and can be no lawful competition.

The defendants demurred to the bill. The demurrer was sustained, and the bill dismissed.

*Levi L. Barbour*, and *Moore & Griffin*, for complainant.

1.  Municipal corporations possess only such powers as are expressly granted to them.—*22 Conn. 552; 12 Ill. 1; 1 Duer, 452; 14 Ia. 494; 1 Kansas, 432.*

The power to grade and pave streets and charge adjacent land owners, is derived from the charter, and that power must be exercised in accordance with its provisions.

Acts authorized by charter must be done in the manner prescribed by that instrument; especially must the power be strictly pursued where such acts affect private property.—*8 Ind. 34; 2 Bos. 173; 7 Id. 601; 23 Barb. 349; 4 Sandf. 221; 18 Wis. 92; 2 Kansas, 357.*

2.  The general power to grade and pave streets is granted to the Common Council of the City of Detroit. *Laws 1857, p. 96.*

But this general power is limited and restricted, and the manner indicated in which it shall be exercised.—*Laws 1857, p. 134.*

Before the adjacent land owners are liable, the contract must be let, or entered into, to and with the lowest bidder.

The simple question submitted by the bill and demurrer is: Was this contract let, or entered into, to and with the lowest bidder, within the meaning of the provisions of the charter?

The legislature had some object in requiring contracts to be entered into with the lowest bidder, some of which may be enumerated, as follows:

*a.* For the purpose of inviting competition, and thereby ensuring to the public the performance of the work at a reasonable price.

*b.* For the purpose of ensuring against any collusive agreement between the corporation or its officers and the contractor, whereby the public might be defrauded.

*c.* For the purpose of affording all possessed of the requisite skill, a fair opportunity of competing for the construction of public works; to encourage the exercise of such skill, and to guard against partiality to individuals.

Surely a contract in which none of the objects which the legislature had in view is attained, but all are defeated, can not be said to be within the meaning of this provision of the charter.

It seems absurd to designate a bid as the lowest bid, when there could be no other bid within the range of legal possibility.

The phrase "lowest bidder" imports that there may be a higher bidder.

The authorities on this question, though somewhat meagre, are directly in point, and quite uniform.

The contract must be let in such a manner that this court, with all the facts before them, can determine who was the lowest bidder; if not, it is void.—*2 Bos. 173; 20 N. Y. 312.*

*A fortiori* it is void, if this court must determine that there could be only one bid, and could not possibly be any

other bid to compete with it.— *13 Barb. 573; 17 N. Y. 584; 33 Id. 309.*

The exact point raised in this cause has lately been before the Supreme Court of Wisconsin — *Dean v. Charlton* — and it was decided that the collection of the assessment could not be enforced against adjacent land owners.

It is undoubtedly true that this view of the case may work a hardship to the contractor; but the contractor is bound to know the provisions of the charter, and had actual knowlege that at the time of the advertisement for bids and his offer, there was no bidder that could lawfully compete with him for the laying and constructing of the Nicholson Pavement.

*G. V. N. Lothrop*, and *Gray* and *Moran*, for defendants.

1. By the Charter of Detroit the most ample authority is conferred upon its Council to grade and pave the streets, and to provide for paying the cost thereof by assessment on the adjacent lots.—*Laws 1857, p. 96, sub. 11.*

This gives the power. Another part of the charter provides the mode of exercising this power, with many other powers, where the expense involved exceeds $200.

It is provided that proposals for bids, with specifications, must be advertised for, and the contract shall be made only with the lowest responsible bidder.—*Laws 1857, p. 134, Chap. 8, § 12.*

It is not required that the Council must accept the lowest responsible bid; only that no contract shall be let except to the lowest responsible bidder. The Council can, if no bid is reasonable, reject them all, and decline to enter into a contract at all.

This, then, as it seems to us, is the correct statement of the case.

The city is clothed with full power to grade and pave its streets, but it is required to conform to a certain mode

in its exercise. This, indeed, operates as a limitation upon the exercise of the power. But if the Council proceeds in the prescribed way, it may use the whole power with which it is clothed. The limitation is not upon the power, but only on the exercise of it.

The legislature prescribes such mode of exercise as it thinks best. And if the mode prescribed is followed, the city is under no limitation or restraint in the extent of the power.

The City Council under the charter is not a mere private agent. It is a public body, clothed with large powers, involving discretion and responsibility. When clothed with a power, all the methods of its exercise, as well as the option of its exercise or not, are in a great measure left to its own wise discretion. Where a rule or mode of exercise is prescribed, then, of course, it must be followed. But, beyond this, modes, occasions and extent of exercise are left to the wise judgment and discretion of the Council.

The Grimshaw patent paving costs only half as much as other methods. But it is a patent. Can not we use it? An improved patent steam fire engine may be a great advantage. Can we not buy one, because only one man can build and sell them? The patent electric fire alarm saves much expense to the fire department, and many thousand dollars of property. But it is a patent. Has the Legislature so tied our hands that we can't buy it? Such illustrations can be indefinitely multiplied. Nor are they ideal cases.

So as to another class of cases. One man may have the only gravel pit or stone quarry, or the only available one. There can be in such case no real competition. Could no stone or gravel be acquired in such case?

Yet we must so hold, if the power exists only where the case admits of actual competition.

It seems to us, with all submission, that the position is wholly untenable.

The power is given. It is given to a deliberative, responsible public body. One general rule is prescribed relative to its exercise. This is prescribed, not as a limitation of the power, but only as a rule of exercise, likely to produce salutary results in most, if not in all, cases. If in some cases it produces less, or even no beneficial results, it does not affect the power of the Council. The Council obeys the legislature so far as it has spoken. Beyond this it is made responsible to those with whose interests it deals, and who, in this as in other matters of public concern, can call it to account. The power which it exercises is absolutely necessary; it must, from the nature of things, in its administration be left largely in the discretion of the Council, and that discretion can only be revised at the polls.

In this case there was no abuse of discretion. This kind of pavement has secured a large hold on public favor, and, in fact, it was laid down on this street by the desire of a large majority of the property holders.

We should then contend that the better rule would be to hold that the provision of the charter in question did not extend to that class of cases where there could be no competition, and that in such cases the Council could exercise its general power without going through the form of advertising, receiving bids, etc.

This is the conclusion reached by the courts of New York, under the provisions of a charter in some respects resembling that of the City of Detroit.

The cases in the New York courts are all summed up and considered in a late case in the Court of Appeals. *Harlem Gas Co. v. Mayor, 33 N. Y. 309.*

COOLEY CH. J.

The complainant seeks to enjoin the collection of a tax levied upon a lot owned by him for the purpose of paying the expense of paving in front of it with the Nicholson

pavement; alleging, as ground of injunction, that the contract for such pavement was illegal, and therefore invalid.

The question of validity arises upon the following facts: The *City Charter, chap. 8, § 12*, provides as follows: "No contract for the purchase of any real estate, or for the construction of any public building, sewer, paving, graveling, planking, Macadamizing, or for the construction of any public work whatever, or for any work to be done, or for purchasing or furnishing any material, printing or supplies, for said corporation, if the purchase of said real estate, or the expense of such construction, repair, work, material or supplies shall exceed $200, shall be let or entered into except to and with the lowest responsible bidder, with adequate security,   *   *   *   *   and not until advertised proposals and specifications therefor shall have been duly published in at least one daily newspaper published in said city, and for such period as the Common Council shall prescribe."

The right to lay the Nicholson Pavement in Detroit, at the time this contract was let, was owned exclusively by the firm of Smith, Cook & Co., the contractors, who alone, therefore, it is said, could and did bid for the contract, and there being no possibility of a competitor, the contract was awarded to them on their own terms. This circumstance of exclusive right, it is claimed, precludes the application of this provision of the charter to such a contract, inasmuch as the purpose of the provision, which was to secure open and public competition, could not possibly be accomplished where there could be but one bidder.

The doctrine of the complainant leads to this conclusion: That wherever, from the nature of the case, there can be no competition, the city can make no contract, however important or necessary for the interest of the city; since contracts, except by public letting, are forbidden by the express terms of the statute, and those by public letting are forbidden by an implication which is equally imperative.

And if applied to this case, however much this mode of paving may exceed all others in utility, it can not be adopted in the city of Detroit, or in any other city with the like provision in its charter, even although the proprietors of the patent might be willing to lay it on terms more advantageous to the city than those on which pavement of less value could be procured.

To support this conclusion, we must import into the statute a condition which we must suppose to pervade its spirit, but which is not expressed by its words. The power which the charter gives to the Common Council to cause the streets to be paved, is conferred by another section in very ample terms — the sole condition imposed upon it being the public letting of the contract to the lowest bidder. The courts, I think, should be very cautious about importing new terms into a statute in order to make it express a meaning which its words do not convey, and they ought, at least, to first make sure that they are not changing the legislative intent, and giving the statute an operation that the legislature never designed, and, perhaps, would never have assented to.

The benefits to be anticipated from the public letting of contracts, must vary greatly in the different classes of cases, according to the extent of competition that is possible or can be excited. If unskilled labor is to be advertised for, or a work which is open to all, and all the materials which are abundant at regular market rates, it is evident that everybody may bid, and the competition be general. But if the work to be constructed require the constant attendance of a scientific overseer, or if some of the materials be scarce, and owned by a few persons only, or if the work be so expensive as to be, according to the terms on which it is to be constructed, beyond the means of most persons, it must be very apparent that in these, and many other cases which can be supposed, the same full benefits of competition are not always to be obtained, which are

probable in the cases first supposed, and that the danger of monopolies and combinations will be proportionately greater.

It will not be claimed, however, that the city has not authority to let contracts in these cases; and even if two persons only are in position to become bidders, it would be conceded that a contract could be lawfully let, even though but one of the two should actually throw in proposals. The security of the city against combinations and extravagant contracts in such cases must rest in the power which the Common Council possess to reject any bid which they might regard as unreasonable; a power which the legislature have evidently considered of some value, as otherwise they would have made the fact of lowest bid conclusive, and the execution of a contract in accordance with it compulsory.

It is very clear, therefore, that the courts can not step in and declare a contract thus publicly let to be void, because the anticipated benefit was not obtained from the competition, if any competition was possible. The statute has fixed a rule from which great benefit will be derived in many cases, and some benefit in most cases; and it has declared, in effect, that contracts shall be valid which comply with that rule. The rule is made general for the benefits that will generally flow from it; and the purpose is to attain those benefits wherever practicable, be they more or less. We cannot declare a contract void on the sole ground that no benefits followed the application of the rule in that particular case, though the Common Council might have refused to enter into it, for that reason, if they had seen fit. And if we can not declare a contract void because of this result, neither, I think, can we do so because, beforehand, the result might be supposed inevitable.

The case was argued as if such a patent right was a thing which stood by itself, so that very few cases could be liable to the objection now taken. This, however, is not so.

The objection would be applicable in any case where the city might have occasion to procure any patented machine, or to let any contract requiring the use of any invention secured by letters patent. It is true that in the case of machines of known utility, the market will generally be supplied at regular rates; but it frequently happens that one person, firm or corporation alone has them for sale, so that there is a practical monopoly, even though some of the machines may be in the hands of individuals who have purchased for their own use. Yet unquestionably other persons than the owners of the right may bid for a contract to supply such machines, relying, perhaps, on being able to obtain the privilege of manufacturing them, or upon purchasing them at the rates at which they are generally sold. Their contract would be valid, notwithstanding they might find it difficult or even impossible to perform it.

But it is sometimes the case that there is as complete a monopoly of some material necessary to the performance of a public contract, as of a patent right the use of which is essential. It might even happen with a common material, that at a particular emergency all that was within reach, or that could be obtained within the necessary time for the performance of the contract, would be owned by a single individual. In such a case, on the complainant's theory, the public work must be suspended, however necessary and urgent. And as a monopoly in regard to any necessary article, however insignificant, would be as fatal as if it extended to all the material, injunction bills of this kind, I fear, would multiply upon us, to the great detriment of the city, since contractors, in making their bids, would be compelled to add thereto a sum sufficient to cover the risks of loss from delayed payments and from possible defeat in a suit in chancery.

But it is not, I apprehend, strictly correct to say that because the patented invention which must be made use of is owned by one person exclusively, therefore, no one else

can be a bidder. Every one has a right to bid, and to take upon himself the risk of being able to procure the right to make use of the invention. Certainly the showing that Smith, Cook & Co. owned the right to put down the Nicholson pavement in the City of Detroit, does not go far enough to show that they alone could bid on a contract for that purpose. If that firm held the privilege of putting down the pavement for sale at a regular price per square foot or yard, the opportunity to bid for a public contract would be as much open to public competition as for any other work requiring skilled labor. For aught we know this was the case; and we may well take notice of the fact that it is frequently by thus selling the "royalty" that the owners of new inventions expect to obtain their reward. The royalty acquires a sort of market value which becomes well understood; and all persons have the benefit of this market value just as much as they would if the ownership and right to control were of such a character that monopoly would be impossible. True, the owner may at any time withdraw the royalty from sale in order to drive hard bargains; but, if he does, the public still retain a security in the power to refuse to contract with him.

The theory of the complainant is that more than one bid in this case was impossible. But suppose, in point of fact, Smith, Cook & Co. had not bid at all, but several other persons, having first ascertained at what price they could obtain the royalty, had entered into a sharp competition for this contract, would it not have been demonstrated that not only was more than one bid possible, but that the very benefits the charter designed to secure by the public letting had been obtained? And if this is so, how can it be said that the fact that a monopoly of the patent exists necessarily defeats all contracts to which the patent is essential?

On the theory of the complainant it is easy to imagine cases in which the court would be placed in the remarkable

position of holding contracts void on the ground that competition was impossible, and, therefore, the benefits of the public letting could not be obtained, when in fact there had been competition, and the benefit had actually been realized.   I do not believe there is any mere implication of the law which can force us to this conclusion; and, to my mind, it is very clear that the legislature would not intentionally have so tied up the hands of the city authorities as to preclude their making use of new and valuable inventions.   I am not, therefore, disposed to put upon the charter a forced construction to that effect, which its terms do not appear to me to justify.

I am aware of the contrary decision which, by a divided court, has been made in Wisconsin in the case of *Dean v. Charlton*, but with great respect for the reasons assigned by that court, I am still brought to the conclusion that the decree of the Circuit Judge was correct, and it must be affirmed.

CHRISTIANCY and GRAVES JJ. concurred.

CAMPBELL J.

I am unable to reconcile the action of the city with the provisions of its charter.   It may be very desirable to allow such a course to be taken, but the prohibition seems to me to be very clear, and if this case can be taken out of it, I do not perceive how, in any case, the citizens can be protected from the very dangers which this clause was intended to prevent.

The charter — *Chap. 8*, § *12* — declares that no contract for paving (or various other things), if for more than $200, shall be "let or entered into, except to and with the lowest responsible bidder, with adequate security, and not until advertised proposals and specifications therefor shall have been duly published in a daily paper."   The same section prohibits contracts with persons who are in arrears to the

city, as well as some others, and forbids contracts requiring mechanical skill to be let to other persons than mechanics.

It can not be claimed that if the monopoly of the pavement in question belonged to a public defaulter, or to one who was not a practical mechanic, any ground of dispensation could be found. Yet the necessity for opening the door would be as great in that case as in any other, if the city needs the improvement. But it has not been deemed safe to allow a full and free choice and we have no power to remit any legislative requirement.

The clause in question can not usually create more difficulty where articles or processes are patented, than in other cases. The patent laws contemplate that things patented shall be offered to the public on equal terms, and so generally is this done that the rule of damages for infringement is governed by the price usually charged. And in most cases, therefore, improvements requiring the introduction of patented articles or methods, are as open to general competition as any others. But if a rigid monopoly is kept up, there can be no competition, and all the evils contemplated by the act are introduced. Instead of obtaining the work at the lowest price, it can only be had at the highest price, which is supposed to fall short of prohibition. Instead of competing skillful workmen, those must be employed whom the patentees see fit to force upon the corporation.

Instead of choice in the quality of materials, it must accept such as the contractor is willing to engage for. And publication of proposals must be an empty ceremony when there is no chance for competition, and when the choice of the patented improvement is practically equivalent to a choice of the contractor at his own price.

The charter was designed not only to provide against extravagant prices, but also, (as is very clear from many clauses), to prevent the opportunity of favoritism and corruption in the Council. If there are several different kinds of paving, and only one is patented, the patentee, retaining

his monopoly, would find it well worth his while to be liberal in inducements to select his plan, and could afford to be all the more liberal because he could recover back his outlay by enhancing his prices. But those whose bids were open to competition would, to say the least, stand on a much less favorable footing. While there is no reason for imputing any wrong motives in this case, and while I do not believe that many public bodies are open to these sinister influences, yet it is not to be denied that this is one of the dangers in the eye of the legislature, and I can conceive of no more fruitful source of possible inducements to corruption than the monopoly of paving the streets of a large city.

It must not be forgotten that while the adoption of a new style of paving may be convenient, it can never be necessary. No patent continues beyond a few years, and a city that is within fourteen years of the last improvement can not be very backward in progress. Moreover, the real merits and durability of a new pavement can never be fully tested very much before the term of privilege has approached its close. As each new plan is generally somewhat expensive, its adoption must always require some consideration. The cost of paving is never a very light burden, where property is unproductive, and falls heavily upon many who are not able to bear any needless charges. Those plans which have been tried and best known are apt to be reasonably economical. The charter requires these safeguards to protect the individual citizen upon whom this expense is charged, and nothing short of necessity can render it expedient to open the door to unchecked expenditure. I can not see any strong reason for assuming that if this very case had been presented to the legislature they would have found in it any occasion for qualifying their language, or for removing the restrictions which they have in terms imposed.

I think the case comes within the spirit as well as the letter of the charter, and that the injunction should be made perpetual.