## GENERAL ACC. FIRE & LIFE ASSUR. CORPORATION, Limited, v. SAVAGE.*

Circuit Court of Appeals, Eighth Circuit.
October 7, 1929.

No. 8326.

*Rehearing denied December 27, 1929.

F. B. Critchlow, of Salt Lake City, Utah (George A. Critchlow, of Salt Lake City, Utah, on the brief), for appellant.

George F. Wasson, of Salt Lake City, Utah, for appellee.

Before VAN VALKENBURGH and COTTERAL, Circuit Judges, and SCOTT, District Judge.

COTTERAL, Circuit Judge. Florence H. Savage, appellee, obtained judgment upon the verdict of a jury against the appellant insurance company upon an accident policy it had issued, on April 8, 1914, to her husband, Herbert F. Savage, naming her as the beneficiary, and insuring him against death from "bodily injuries effected directly and independently of all other causes through accidental means."

The main grounds urged for reversal are (1) that the evidence is insufficient to show that the insured sustained an injury that was the sole cause of his death; (2) that competent testimony of physicians, particularly of Dr. Galligan, was erroneously excluded; (3) that the right of the company to an autopsy was denied by the plaintiff and not adequately covered by the instructions to the jury.

The plaintiff claims her husband was in sound health before he sustained an accident, and the accident solely caused his death. The defendant claims he was afflicted with heart disease, and his death was due to that alone, or in combination with the accident. Because the sufficiency of the evidence is in question, we must review it, with regard to the accident and his previous physical condition. We first notice the testimony aside from that of Dr. Galligan.

At about 1:30 p. m., on December 31, 1926, Savage fell on his back at the fifth or sixth step, and slid "bumping down" to

the bottom of the stairs, in the basement of the City and County Building, at Salt Lake City. He arose and said to the janitor he was all right, but after walking 30 feet to a boot black stand he sat down in a chair and said: "My God! I hurt my back. It is killing me, won't you do something for me"—adding he had slipped on a cigar stub, hurt himself, and wished he had been more careful. The janitor found he had no pulse and was cold. Some one gave him soda. He also said to Mr. Jensen, who came to him, "I am hurt awful bad," and complained of a pain in the small of his back on the right side, stooping and putting his hands on his back. He was taken to the sheriff's office and put on a couch. According to Jensen's account, he kept complaining every few minutes and would say, "God! that hurts me;" then he would feel easier and the pain recurred. His hands were cold, and they rubbed his hands and arms. His pulse was never more than 50, and down to 40 or 41. A Mr. Lawrence came and gave him a little whisky.

In half an hour Dr. Galligan came, put a stethoscope on his heart, felt his pulse, and said he would give him a little strychnine to bolster up his heart. Savage wished to go home, but he was taken to a hopital, Jensen accompanying him, and Dr. Galligan followed soon. On the way he again complained of pain in his back on the right side. He made no complaint to the doctor, except of his back. The doctor again said he would give him something for his heart, and return later and see what was the matter with his back, after ordering hot water bottles placed at his back and feet. The only complaint Savage made at the hospital, until 30 minutes before his death, was the pain in his back near his right kidney. Then he complained of his chest and lungs, as if there was a load of bricks on his chest, saying, "I don't know how long I can stand that; it is just so heavy it seems I can't lift that load." His back was never examined. The nurse said he complained only of a pain in his stomach; he was slightly cyanotic; he was propped up in bed, and hot water bottles were applied to his body. He died at 3:45 that afternoon, before the doctor returned.

He had left home that morning, saying to plaintiff he would go to Dr. Galligan's office to make him a present of a pair of gloves, visit the County Building, and return. At noon he telephoned her he would be at home early that afternoon. At 2:25, Dr. Galligan telephoned her Savage had met with an accident; it was nothing to worry about; he was all right; she didn't have to hurry, but to come down and see him; she could take him home in the evening if he were feeling all right; he didn't want to send him home, as it was too cold, and it would be better to send him to the hospital. She went immediately, arriving there at 3:50, but he had just died.

Dr. Galligan, called only by the defense, testified regarding the accident and his prior affliction. He had known Savage eight or ten years; treated him frequently for five years; his calls at the office being both social and professional. He was there at about 12:45 on December 31, 1926, and gave the doctor a pair of driving gloves. At the sheriff's office he told the doctor he had slipped and fallen on a cigar stub and hurt himself, pointing to his stomach and tenth rib area, and thought he would be all right if he could get the gas off of his stomach. The doctor gave him a "hypodermic" of strychnine to bolster up his heart action, finding him very ill and desirous of going home, but told him he should go to the hospital and he would telephone his wife. His pulse was 48, regular, slow and weak; he was cyanotic; his breathing was labored and shallow, with a grunting respiration, which he claimed to be due to pain in his stomach and right side. At the hospital, he was found to be in an extremely critical condition, and cyanotic. The doctor examined his heart, abdomen, liver, and back, and gave him a heart stimulant. His pulse had not increased. His abdomen showed no evidence of distention or rigidity; he complained of much pain chiefly in his chest, and a feeling of pressure and difficulty in breathing. The doctor signed orders for the nurse of caffein and sodium benzoid, heat, liquid foods, elevation of head, and enema. An examination after Savage's death showed no sign of bruise or fracture, internal hemorrhage, or injury to liver or spleen.

The doctor had an opinion as to the cause of his death, which would be incomplete without reference to prior information or history of the case, the other contributory factors. He signed a certificate of death, showing it was due to "Acute Cardiac Dilatation, 2½ hours, contributory, fall on steps of County Building (secondary)." On the cover of a hospital folder or chart prepared by him appeared, "Traumatic shock from fall." His final diagnosis was, "Acute Cardiac Dilatation, traumatic shock from fall, a progressive heart disease, enlargement of the heart, a damaged heart, etc."

Mrs. Savage also testified regarding the health of her husband. He was very well the morning of the day of the accident; his health had been generally good; he had not complained of being ill for years any length of time, and during 16 years of their married life he never complained of heart trouble or organic disease. He took care of the fruit and chickens, helped cut the lawn, became tired, but not more so than other men. When he telephoned at noon on December 31, 1926, he did not mention his health. He was never seriously ill; once had ptomaine poison—in 1923—developed from a banquet, but didn't have dizzy spells and worked all that day. He had consulted Dr. Bailey about it. Dr. Galligan came and prescribed for him. He was confined to the house for three days. She did not recall any other doctor treating him for three or four years, except occasionally Dr. Beer for stomach trouble. He had gastritis in 1924 or 1925. Dr. Galligan did not tell her of seeing him just before the fall, nor that he had a heart attack. Two acquaintances testified to his physical activities, apparent vigor and health, and the absence of complaint by him. The janitor at the County Building said that, before the accident, he looked apparently well—erect and steady.

Dr. Beer testified he knew Savage about 25 years and treated him as a patient, but never discovered any heart disease. Examining him several times, he found him suffering at times from irregularity of digestion or bowels. In answer to hypothetical questions based on the testimony connected with the accident, his opinion was he died from internal hemorrhage as a result of the fall; there was no evidence of acute dilatation of the heart, but, if there was, it was due to a reflex nervous condition brought about by the accident. He saw Savage about Christmas, and he seemed to be always perfectly well. Dr. Richards, on like hypothetical questions, expressed the opinion that the accident precipitated the death, and it could have been due to a rupture of a blood vessel, a blood clot, or the shock; he did not think there was a dilatation of the heart. Dr. Brown examined Savage for insurance in March, 1924, and found his heart and pulse and blood pressure and urinalysis normal, and no physical defect. On December 8, 1926, his general appearance was good, with normal blood pressure, pulse, heart, lungs, and kidneys.

Dr. Viko testified for the defense upon hypothetical questions that in his opinion the principal cause of the death was heart disease and the fall the contributory cause. Dr. Van Scoyoc testified also for the defense; his opinion based on like questions was the death was caused by heart disease, which may or may not have been contributed to by the fall, and the fall would not cause a rupture to the kidney or the liver. [1, 2] From his résumé, it appears on one side there was evidence of prior health, absence of symptoms of heart trouble, the fact of the accident, and expert opinion the death was due to the accident. On the other, the evidence, including opinions, tended to establish heart trouble was a primary or one cause of the death. In determining whether the finding of the jury was justified, the test to be applied is whether there was substantial evidence to sustain it. A. B. Small Co. v. Lamborn & Co., 267 U. S. 248, 45 S. Ct. 300, 69 L. Ed. 597; Dustin Grain Co. v. McAllister (C. C. A.) 296 F. 611. There was such evidence before the jury. It warranted a finding in favor of the plaintiff on the issue, and the verdict was properly accepted by the trial court.

Two special grounds are advanced to establish a waiver of the objection to the testimony of Dr. Galligan respecting the physical condition of Savage prior to the fall: First, because the plaintiff made the doctor's treatment after the fall and statements to and by him during such treatment a part of her case; second, because a part of the doctor's chart, disclosing the words "traumatic shock from fall," was shown to the jury by plaintiff on cross-examination as a part of his final diagnosis. The questions put to this witness and the offer of proof explicitly sought to elicit the fact that Savage had been previously afflicted with heart disease.

The Utah statute (Compiled Laws 1917, section 7124) is as follows: "A physician or surgeon cannot, without the consent of his patient, be examined in a civil action, as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient."

The doctor was called by the defendant. He was asked and answered fully concerning his visit to the sheriff's office and communications with and treatment of Savage. The objections came when he was asked about a prior call upon him by Savage at 12:45. He said Savage gave him a pair of gloves, and made a statement about his health. He was asked whether Savage was well or sick at the time, and again if he treated Savage, and the answers were excluded; also as to a question whether the

doctor made any statement as to what was the matter with Savage. The doctor was asked and answered fully as to events at the hospital. The death certificate prepared by him was first excluded, but later objection was waived and it was introduced. The doctor said he had an opinion as to the cause of the death. The court ruled he might give answers, but not by considering previous history. The doctor then said he could not answer completely without it, and this answer was repeated more definitely. The doctor identified "Exhibit A" as the order or chart he wrote and left for the nurse. It was excluded on objection that it was incompetent. The death certificate signed by the doctor was then introduced by the defendant. It recited (as before stated) the cause of death was acute cardiac dilatation, duration 2½ hours; contributory, fall on steps of County Building (secondary).

Following this, certain questions were proposed by counsel for the plaintiff, after he stated it was without waiving his right of privilege, and then he picked up the folder on the hospital chart, one of the sheets of which had been offered as "Exhibit A" and excluded, and asked the doctor if that record was signed by him and it appeared there his final diagnosis, chief pathalogical condition was "traumatic shock from fall," and he answered the questions in the affirmative. The witness was asked fully about this on redirect examination, and he was examined at some length, until it was elicited that by the use of the words "acute heart dilatation" his impression was "it was the end stage of a heart that was damaged, plus the history that the man had had a severe fall," and by damaged he meant "that there had been some process going on over a long period prior to the death of the individual." He was asked this question, "In other words, it was a diseased heart?" On objection, the court ruled the reference to "his past history" should be excluded. Later the doctor testified he examined Savage in December, 1923, and, being asked if he was then suffering from a diseased heart, an objection was sustained.

The doctor was asked if, as a result of the final diagnosis on the chart, his opinion was that the acute dilatation of the heart was the result of a pre-existing disease, and an objection was sustained. Asked if that diagnosis was based on what he saw at the hospital and the sheriff's office, and previous knowledge as to condition of him acquired before that day, an objection was also sustained. His statement to Mr. Wright that

the death was due to acute dilatation superinduced by a fall, as a contributory element, was based on his entire knowledge. It was urged that defendant was entitled to inquire further as to the cause of the death, and the court ruled the question was not opened by the examination for the plaintiff.

The defendant offered to prove by the witness certain facts, to wit, that on December 31, 1926, at 12:45, Savage told Dr. Galligan that he was sick and asked to be examined, saying he was in apparent distress, complained of pain in the pit of his stomach, the doctor was of the opinion he was suffering from a serious disease of the heart, advised him to go home immediately, and go to bed, Savage stated he had a little business to attend to at the County Building first, and then would go home, and that in the opinion of the doctor the primary cause of the death was the same diseased condition of his heart. The offer was excluded on objection.

From this reference to the evidence, we hold the plaintiff did not waive her privilege on the second ground urged by offering the cover sheet of the hospital record. It was elicited on cross-examination with an effective reservation against waiver. See 10 Ency. Ev. p. 150. Again, the same matter was shown by the certificate of death and in various other ways, and was not questioned, and, being a mere repetition, it was harmless in its influence upon the jury.

The defendant must therefore be confined to the first ground of alleged waiver. Counsel rely mainly on the two cases decided by the Utah Supreme Court—Dahlquist v. D. & R. G. Co., 52 Utah, 438, 174 P. 833, and Moutzoukos v. Mut. Ben. Health & Accident Ass'n, 254 P. 1005—both of which proceeded upon general principles rather than the state law, which we have quoted. The above cases well illustrate the apparent confusion in the authorities. It is largely accounted for by different statutes defining a privilege that did not exist at common law. The first prevailing opinion in the Dahlquist Case held the plaintiff waived objection to a physician's testimony when he testified concerning his treatment and injuries and called another physician to testify to the extent of them. The second opinion was to the effect that the plaintiff only waived the privilege by testifying to the physician's statement about the injuries and treatment. The third opinion concurred with the second. There was a dissenting opinion by one Justice, in which another concurred. In the Moutzoukos Case,

592

the Dahlquist Case was followed, in holding that testimony of the plaintiff to the favorable opinions of the doctor concerning his physical condition removed the bar to his testimony.

We are unable to agree with the first opinion in the Dahlquist Case, some of the authorities cited being either inapplicable or unsound, and we regard it as opposed to the doctrine of Arizona & N. M. Ry. Co. v. Clark, 235 U. S. 669, 35 S. Ct. 210, 212, 59 L. Ed. 415, L. R. A. 1915C, 834, where it was said: "The chief policy of the statute, as we regard it, is to encourage full and frank disclosures to the medical adviser, by relieving the patient from the fear of embarrassing consequences. The question of dealing justly as between the patient and third parties is a secondary consideration."

But the cases are distinguishable, in that the plaintiff did not testify regarding the injury to her husband from the fall, or the treatment given to him, her witnesses did not testify to any opinions of Dr. Galligan, and the doctor's conversation with her was but a reassurance the injury was not serious to allay fear, it was obviously incorrect, it did not rise to the dignity of a professional opinion, and the jury could not have so regarded it. In Steen v. First National Bank, 298 F. 36 (8 C. C. A.), it was held that a party after testifying to confidential communications waives objection to the testimony of the other parties to them. In Union P. R. Co. v. Thomas, 152 F. 365 (8 C. C. A.), the court ruled the waiver of communications between the physician and patient arose from the testimony of the latter to them.

Our view of the authorities is they fairly establish that, where a statute does not define a waiver of the bar against the testimony of a physician, the mere fact that the injured party or his successor in interest testifies does not waive the bar; that, if he testifies to communications with and opinions of the physician, there is a waiver as to such matters; and that calling one physician is not a waiver as to another, except with regard to the same consultation. See 10 Ency. Evidence, pp. 147, 148, 149, 145. We hold, therefore, that there was no waiver of privilege on the first ground taken for the appellant, and that the trial court committed no error in his rulings upon the testimony of Dr. Galligan. The like view applies to the contentions upon the testimony of the other physicians as witnesses in the case.

The next question relates to the refusal of the plaintiff to permit an autopsy. The policy provides:

"Section 4. Written notice of injury on which claim may be based must be given to the corporation within 20 days after the date of the accident causing such injury. In the event of accidental death immediate notice thereof must be given to the corporation.

"5. Such notice given by or in behalf of the insured or beneficiary, as the case may be, to the corporation at 55 John street, New York City, N. Y., or to any authorized agent of the corporation, with particulars sufficient to identify the insured, shall be deemed to be notice to the corporation. Failure to give notice within the time provided in this policy shall not invalidate any claim if it shall be shown not to have been reasonably possible to give such notice and that notice was given as soon as reasonably possible."

"8. The corporation shall have the right and opportunity to examine the person of the insured when and so often as it may reasonably require during the pendency of claim hereunder, and also the right and opportunity to make an autopsy in case of death where it is not forbidden by law."

A statute of the state of Utah (Comp. Laws 1917, § 8124) provides: "Any person who mutilates, disinters, or removes from the place of sepulture the dead body of a human being without authority of law, is guilty of felony. But the provisions of this section do not apply to any person who removes the dead body of a relative or friend for reinterment, nor to any physician who shall make a post mortem examination with the consent of relatives or friends of the deceased."

The trial court instructed the jury as follows:

"Under the statute above quoted it was not unlawful to perform an autopsy on the deceased after burial and after the 13th day of January, 1927, if the plaintiff, the wife of the deceased, had consented to it; and under the aboved quoted provision of the policy the defendant was entitled to perform an autopsy on the body of the deceased unless it unreasonably delayed making demand to exercise such right.

"It was the duty of the defendant to exercise due diligence after notice of death of the deceased to claim the right and opportunity to make an autopsy. Whether the defendant exercised due diligence after notice of the death of the deceased is a

question in the case to be determined by you from all the facts in evidence before you. Whether the company unreasonably delayed making demand to perform an autopsy, and thereby waived the right, is, I say, a question in the case of the facts for you to determine from all the pertinent evidence in the case.

"If the demand to perform an autopsy made by the defendant in the letter mailed the 13th of January was made within a reasonable time under and in consideration of all the facts and circumstances of this case in evidence before you, then the refusal of the plaintiff to permit the defendant to perform an autopsy would prevent recovery by her and your verdict must be for the defendant.

"If, on the other hand, you shall find under all the pertinent facts and circumstances in the case before you that the defendant delayed unreasonably in making demand to perform an autopsy on the body of the deceased, the refusal of the plaintiff to perform it would not constitute any defense to plaintiff's suit."

Several requests for instructions were tendered by the defendant to the effect that the defendant had no duty to demand an autopsy until it had notice the death of the insured was accidental within the meaning of the policy and the loss claimed therefor, that the right was not waived unless the demand was unreasonably delayed after such notice, and that the autopsy was not required before the burial of the insured. The refusal to give these requests is said to have been prejudicial error.

The facts pertaining to this branch of the case are not in dispute. Savage died on the afternoon of Friday, December 31, 1926. The body remained in the undertaking parlors from that time until the funeral services, which commenced at 2 p. m. of Monday, January 3, 1927, and the interment occurred at about 3:15 p. m. that day. E. L. Sloan, the local agent of the defendant, was in California at the time. His son, who was secretary of the fire department, took care of the detail work of his father's office and had charge of it. The son and an aunt, Miss Sloan, answered telephone calls for the elder Sloan. On January 3, the son was at the office from 12 to 2, and after 5 o'clock. He had a telephone conversation relative to notice of proofs of loss for this death, with his aunt, who called him in the afternoon of that day. On Sunday, January 2, 1927, not earlier than 8 p. m., he sent a telegram to the company, as follows:

"Night Letter. January 2, 1927. General Accident Assurance Corporation, Fourth and Walnut Streets, Philadelphia, Penn. Assured under Utopia Accident Policy, 508202, renewal certificate 109990, Herbert F. Savage, fell December 31st, and died same date. Please send immediately necessary blanks.

"Collect. E. L. Sloan."

On January 3, A. W. Wright notified the local office of the company of the accident and death of Savage, and asked them to get the blanks to file a claim. He called the office that morning, and told the junior Sloan Mrs. Savage wanted him to take care of the proof of death for her. Sloan replied they did not keep papers in the office, he had wired for them the day before, and when they reached him he would be glad to turn them over; also stating he had noticed Savage had been accidentally killed. Miss Sloan testified she had a telephone conversation with some one in Wright's office on the afternoon of January 3, and was then told of Savage's death. She had heard of it in the paper. He asked if she would send the papers, and she told him she was not privileged to do that, but would get in touch with the junior Sloan, and immediately she called him and informed him of the facts.

The company doubtless had notice of the claim in the early morning of January 3. True, the notice was given by young Sloan, representing the local agent, but Wright's conversation early the next day was a notice to him of the accidental death of Savage, and of the plaintiff's desire to make a claim therefor against the company, and he took no further step at the time on account of the telegram. We think these transactions should be regarded as notice to the company, early on January 3, of the accident and the claim of the plaintiff to the insurance. On January 13, 1927, the defendant's attorneys wrote the plaintiff, requesting for the company, upon instructions, permission for an autopsy upon the body of Savage, asking her answer in any event within 10 days. The letter admitted notice to E. L. Sloan of the accidental death of Savage on December 31, 1926. The request was refused by her.

The policy itself conferred the right to examine the person of the insured as often as the company might reasonably require, and also the right and opportunity to make an autopsy in case of death. These provisions, construed together, gave the right to an autopsy when reasonably required. As it was not agreed the request should antedate

the burial, it was sufficient to make it in a reasonable time after the death.

We think the charge of the court was sufficient. There was no way to determine whether the request was made within a reasonable time but to obtain a determination by the jury. It was a question of fact under all the circumstances. As counsel for the plaintiff insist, the autopsy could have been made on January 3, after the telegram from Mr. Sloan reached the company that morning, and before the funeral that afternoon. This was most appropriate, but, of course, unnecessary under the policy, as the company had a reasonable time to demand the privilege. The autopsy was important enough, in view of the very serious claim of the company that the insured came to his death because of heart disease, at least in part, which would be a complete bar to plaintiff's recovery. Yet the right to the autopsy was conditioned by contract upon a request within a reasonable time. The jury resolved the question upon the evidence in favor of the plaintiff, and we hold it was a finding of fact, which should not be disturbed on appeal.

The jury certainly understood from the charge that the privilege of an autopsy must be within a reasonable time after notice of the death from accident on January 3. No further notice was necessary, after it developed that on January 2, 1927, the agent's telegram notified the company of the fall and death of the insured on December 31, 1926, and asked for blanks, evidently meaning for proof of loss under the policy, and, after plaintiff's agent learned of the telegram, naturally no further step would be taken in her behalf to that end. The contention of appellant is hypertechnical; and it is, virtually, that the company had actual notice, through its local agent, of the accidental death, as the plaintiff knew, and on account of which she did not act further, yet she should have given the company additional and formal notice. We cannot agree there is merit in this contention.

We think the further request that the demand for the autopsy need not have preceded the funeral was unnecessary, and was sufficiently covered by the charge as given, inasmuch as the jury was directed to find for the defendant if the request was made within a reasonable time after notice of the death, and this clearly meant and must have been understood by the jury as relating to the time before as well as after the funeral.

We find no prejudicial error in this record, and accordingly the judgment of the District Court is affirmed.