Hy Brutsche et al., Appellants, v. Coon Rapids et al., Appellees,
Fairbanks Morse & Company, Intervenors.

No. 43865.

April 6, 1937.

Helmer & Minnich and George A. Rice, for appellees.

William Hassett and Poppenhusen, Johnston, Thompson & Raymond, for intervenors.

Salinger, Reynolds & Meyers, Harry Wifvat and Graham & Graham, for appellants.

MITCHELL, J.—Three citizens of Coon Rapids, Iowa, users of electric energy in their respective homes, purchasing same from the manufacturer thereof at a rate fixed by the town of Coon Rapids, commenced this action in equity for themselves and all others similarly situated, to enjoin the construction of a complete municipal electric light plant by the incorporated town of Coon Rapids, pursuant to the provisions of the Simmer law. Fairbanks, Morse & Company filed a petition of intervention. After a hearing the trial court dismissed plaintiffs' petition and held that they had not shown themselves entitled to the relief prayed. Plaintiffs have appealed to this court.

Coon Rapids has no generating or distributing facilities but is served by the Iowa Electric Light and Power Company, which has both in that town. On the 15th day of February, 1934, there was submitted to the qualified electors of Coon Rapids the question of the construction of a municipal light and power plant. "Shall the town of Coon Rapids, Iowa, Carroll County, erect and construct a municipal light plant, at a cost of not to exceed the sum of $114,000, to be paid out of the future earnings of the plant?" A majority of the duly qualified electors voted in favor of constructing a municipal light and power plant. Thereafter a contract was let to Fairbanks, Morse Construction Company, which contract was held void by this court in a cause entitled, "Brutsche et al. vs. Town of Coon Rapids et al.," and reported in 220 Iowa 1295, 264 N. W. 696.

On March 25, 1936, the specifications calling for bids for the furnishing of a complete municipal light and power plant for the town of Coon Rapids were filed in the office of the city clerk. They were introduced at the trial of this cause as Exhibit C and will hereafter be thus referred to. Within the time and as required by law there was published a notice, stating that a meeting would be held on the 28th day of April, 1936, at 2 p. m. in the town hall, at which time and place objections would be heard and bids received, all in accordance with sections 6134-d1 to

6134-d7 of the Code of Iowa for 1935, otherwise known as the "Simmer" law.

Pursuant to the notice published, there were duly filed objections to any offer, proposal or bid submitted at the meeting of the city council on April 28, 1936, which objections were signed by approximately two hundred of the taxpayers, citizens, water and electric users of the town of Coon Rapids.

At the meeting these objections were read and counsel representing the objectors were given permission orally to object. The city council thereafter overruled the objections and passed a resolution, adopting the plans and specifications as filed. There were several bids on file. All of them were opened and considered. By resolution of the city council the bid of Fairbanks, Morse & Company was accepted and contract awarded to that company, and all other bids and proposals were rejected. This action to enjoin the city counsel having been commenced before the letting of the contract, the contract was not then executed.

The appellants argue that the lower court erred in not holding that the specifications were so indefinite, sketchy and lacking in detail as to furnish no common basis for the submission of competitive bids; that Coon Rapids was without power to make any contract under the proceedings had, because, among other things, there was no determination by the council, in advance of the advertisement, of the kind of materials to be used in the proposed work; that one of the respects in which the specifications were not precise and definite, was in respect to the materials of which the engine was to be made; that due to the failure to specify the kinds of material or the standard to be used, there could not be competitive bidding. Appellants complain bitterly because the specifications do not name the materials out of which are to be made the various parts of the Diesel engines to be used in the light plant. It is their contention that before you can have competitive bidding it is necessary that the engineer employed by the municipality require that the materials used, the workmanship and efficiency of the engines, auxiliary equipment, machinery and appliances used, shall conform to the minimum standards prescribed by various national codes; that when that is done there is a common basis and a fixed standard to which all bidders are required to respond, and any bidders whose engines, auxiliary equipment, generators, accessories and switchboard do not equal the minimum standards

fixed by these codes, is not entitled to have his bid considered.

 The necessity for competitive bidding is so settled now that it cannot be questioned. Under the Simmer law this court has repeatedly held that competitive bidding is required. In what is known as the Grand Junction case (Iowa Electric Light & Power Co. v. Incorporated Town of Grand Junction), 216 Iowa 1301, on page 1303, 250 N. W. 136, 137, this court said:

"This statute was undoubtedly enacted for the purpose of obtaining competitive bidding and to enable municipal corporations to secure the best bargain for the least money. Such a statute clearly required competitive bidding."

And continues on this same page: °

"In our opinion, for every purpose of genuine competition between bidders there is and can be no such thing as too great particularity in the description of the subject concerning which competition is invited. In order that bidders may really compete, *they must have in mind precisely the same thing.*"

The legislature may overrule the result reached in the Grand Junction case (altho some of us dissented), but this court does not recede from the statements of the law therein contained concerning competitive bidding. The necessity for competitive bidding is too apparent to leave room for argument, and in order to have competitive bidding the respective parties desiring to bid must know upon what they are bidding.

With these rules in mind let us look at the record before us.

The specifications known in the record as Exhibit C and set out in the abstract, cover sixty-three printed pages. The notice was published in the Coon Rapids Enterprise and the Des Moines Register, and there appears to be no question that the proper notice was given. These specifications and the accompanying plans, Exhibit C-1, call for bids on the complete furnishing of the light and power system of Coon Rapids, consisting of:

(a) Power plant building, described in section 1 of Exhibit C, comprising eight and a half pages;

(b) Diesel engine units, described in section 2 of Exhibit C, comprising eleven pages;

(c) Switchboard and power wiring, described in section 3 of Exhibit C, comprising ten pages;

(d) Electric distribution system, described in section 4 of Exhibit C, comprising nine pages;

(e) Building site, described in specifications under "Instructions to Bidders" as: The south one-half of lots 1, 2, and 3, block 21, Milwaukee Land Company addition to the town of Coon Rapids, upon which the town had an option to purchase at a price of $1,000.

These divisions of the specifications, Exhibit C, are further amplified and supplemented by the plans, which are thereto attached.

The main attack of the appellants upon these specifications is centered upon division 2, which is that part of Exhibit C which describes the Diesel engine generating unit. It was the desire of the town of Coon Rapids to obtain a generating plant of two Diesel engines, directly connected to two alternating current generators, with all of the necessary auxiliary equipment and appurtenances "to make the equipment complete and ready for use."

There are some twenty-two manufacturers building Diesel engines within the size range and rotative speed arrangement specified in Exhibit C that would meet the requirements of this town, but these manufacturers do not build engines which are alike, either in respect to the materials used in the component parts or with respect to design. Some manufacturers believe it is desirable to use a certain material in the construction of the base or frame, or the cylinders of their engines, while another uses a different material in the construction of these same parts.

Now, under the claim of the appellants, the specifications should have set forth the kind of material of which the various parts of the Diesel engine should be made, or at least, they say, they should refer to some code, it appearing that there are organizations or societies which have special codes worked out for testing different materials and recommending what should be used. If you specify the exact material of which the various parts of the Diesel engine should be made, you thereby limit competition to those few manufacturers who, in constructing their Diesel engines, use the materials set out in the specifications. Or, if you make reference to certain codes, you would also limit competition to the manufacturers who build their engines in accordance with the respective codes to which you refer. Diesel engines are not built or constructed for a certain specific

job; they are built for general use, and when the manufacturer builds a Diesel engine he would have no idea what specifications some certain engineer out in the town of Coon Rapids was going to call for.

After all, what the town of Coon Rapids is interested in securing, is a Diesel engine for its electric plant that will perform the necessary work, for the least possible money.

The writer of this opinion is not acquainted with the mayor or the members of the city council of that thriving town, but he believes that, even if they were graduate engineers, yes, of the leading colleges of the land, manufacturers engaged in the business of building Diesel engines are in a far better position to specify the various materials out of which the numerous parts of the engine should be built, than would be a city council or a city engineer, interested only in the proper construction and equipment of an electric generating plant in their own home town. If Coon Rapids did buy a specially built engine, with parts built of the materials specified by the city council and its engineer, the cost of that engine would be several times the cost of a regularly manufactured engine. No two engines are alike, and the town wants competition. If the appellants' contention is to be followed, it would be utterly impossible, either in the specifications themselves or by reference to some code, to determine in advance of the letting, the material to be used in the crankshaft, cylinders, wrist pins, connecting rods, pistons, bolts and nuts.

The views expressed in this opinion might be seriously questioned if they were backed up only by the views of the writer hereof. However, the appellants furnish the evidence. They introduced a Dr. Maleev, whose qualifications were, by consent, omitted from the abstract. The testimony given, and the fact that he bears the title of ''Doctor'', show clearly that he is a man of standing in the profession and well versed in regard to Diesel engines. Dr. Maleev had experience in Germany, Russia and in this country, in the manufacture and construction of Diesel engines. We quote from the Doctor's testimony:

''So far as the engine here, I would be frank that I don't think the specifications should describe and design what the engine must be, because there are, at present, many engines built with welded steel frames, which, in certain respects, are better than grey iron casting. I think the manufacturer knows

better what he is using and a reputable manufacturer will have what is best if it is an established manufacturer. * * *

"With respect to the engines manufactured by those people, you would have about the same difference with respect to design and materials and treatment of materials that exist in the automobile industry. * * *

"It happens in this instance that out of 21 people who manufacture engines suitable for this purpose, two or three manufacturers happen to have exactly the same size, but generally, there may be differences in bore and stroke and revolutions. * * *

"The purchaser is interested in engines only so far as they are sufficient and satisfactory to drive the generators which are to furnish the electrical output. * * *

"I would not undertake to design two Diesel engines for the municipality. I would leave it to the manufacturer."

"Two engines may produce the same horsepower and still be entirely different from their physical dimensions, design and so on."

"A blueprint of Fairbanks, Morse cylinder would probably be different from a like blueprint of the McIntosh-Seymour— most certainly would be. You would find differences not only in the design but also differences in the composition in the metals and materials of which the engines are made. * * *

"It wouldn't be advisable to limit the materials of which the bases, frames and cylinders shall be made, even as Mr. Harrington has done. * * *

"Each manufacturer has his own idea about what materials he should use and the design may vary and may require for the best purpose, slightly different materials."

And again: "Q. Isn't it a very dangerous and hazardous thing, Doctor, for the engineer for the town to attempt to say just exactly what the different parts of a Diesel engine shall be made out of? A. Yes, I consider it so because the majority of engineers are not designers and they don't know and are not supposed even to know what the best is."

Again: "Q. As a matter of fact, you would never know whether or not the manufacturer had complied with your directions, assuming that you had undertaken to tell him how to make his engine? A. No, it is a destructive test necessary, which is expensive and nobody will ever do it.

494

"Q. Did you ever hear of any municipality buying a Diesel engine, then taking it apart to find out what the different entrails were composed of? A. No. * * * Naturally the manufacturer makes his own design, decides what materials or metals or alloys which shall be used. * * *

"Q. Yes, if you were doing it, would you make it more definite than that? A. No, I don't think that would be necessary. I have gone over pages 18 and 19 of these specifications. It is really not specifications of materials. It is more referring to the design as such because the design of the steel connecting rod is different from the design of an aluminum connecting rod which is used by some. I wouldn't attempt to specify exactly materials. Where Mr. Harrington undertook to make specifications he either adopted a prescription which is quite meaningless and where it is meaningless, it may exclude some bidder. I don't think that I can answer for the manufacturer who will bid because sometimes they are bidding on something which is contrary to their specifications. Right now, here I see the specifications require bronze bushings. Fairbanks, Morse has roller bushings, doesn't have bronze bushings, and they bid on it, so I didn't pay any attention to this, so maybe the specifications made out very precisely and some manufacturer in spite of it will still bid, so I can't answer whether or not it will be practical to make such specification. If you make minute descriptions of an engine, you will either exclude a number of manufacturers who are building Diesel engines or you will have bids from manufacturers who are not so very scrupulous in following the specifications and will disregard it. However, if I may add, I say there are still some limitations which may be reasonably put in. Limitation of speed. In large units it will be necessary for them for it is hard to get repair parts."

And so we find this expert—appellants' expert—stating to the lower court and to this court, that "if you make minute descriptions of an engine, you will either exclude a number of manufacturers who are building Diesel engines, or you will have bids from manufacturers who are not so very scrupulous in following the specifications and will disregard them." In other words, that means you will limit competition. That which the appellants are so anxious to have, competitive bidding, will, under their own theory and by their own evidence, be limited to

those few manufacturers who are able to build, following the minute specifications that have been given.

Let us look at the specifications.

In looking at the specifications one cannot help but notice the difference between the nature of the things to be furnished under section 1 and those to be furnished under section 2, and will see the necessity for the difference in the specifications covering these two sections, if competitive bidding is required. Under section 1 the town is asking the contractor to furnish brick, concrete, structural steel, masonry, and woodwork, all of which is available from hundreds of different sources. And then the town is asking the contractor to fabricate those exact materials called for, on the ground, into a building. Under section 2 the town is asking the bidders to submit bids for the furnishing of machinery and equipment which is designed and fabricated by manufacturers in accordance with their own specifications, at their own factories. A 250 H. P. McIntosh-Seymour Diesel engine may be considered identical with a 250 H. P. Fairbanks-Morse Diesel engine in that each is identical in purpose; that is, each will produce 250 brake horse power. But, in a more exact sense, they are not identical at all, any more than two automobiles are identical. From the point of view of the purchaser the two things are identical because the purchaser is not buying crankshafts, cylinders, wrist pins, connecting rods, pistons, bolts and nuts, but is buying a complete operating unit, pre-fabricated and pre-assembled by some manufacturer, who, thru experience, has found the best design and best materials for the various component parts of his own product. In either case the thing to be furnished should be described in the language of the code itself "as nearly as practicable". But the difference is that it is practical to describe the building under section 1 in minute detail and still get competition, whereas it isn't practical at all to go to that extent in describing the Diesel engine.

The appellants cite various cases to sustain their contention, including the case of Hoffman v. City of Muscatine, 212 Iowa 867, 232 N. W. 430, 77 A. L. R. 680. However, the cases cited by appellants are "paving" cases. It is entirely different to draw specifications for the construction of certain paving than to prepare specifications to provide two Diesel engines for the operation of a generating plant in some town or city in the State. Pavement is made of certain materials. The kind of materials

to be used can be specifically set out; the mixture, and the manner of construction can be specified. This can be done because the materials are easily obtainable and the work is to be performed in the town itself. Not so with Diesel engines. The town of Coon Rapids does not want a specially made engine for its plant. It wants to have bids upon, and purchase, what can be called a ''stock engine'', manufactured by reputable manufacturers, exactly as if the town were in the market for an automobile. It would not design one of its own or specify the materials to be used, but would call for bids from the manufacturers of Chevrolet, Ford, Plymouth, et al., and the specifications would be sufficiently broad to permit these different automobile manufacturers to comply therewith.

In Ampt v. Cincinnati, 17 Ohio Circuit Court Reports 516, at page 521, we find the following:

''The difficulty that presented itself at once to the trustees in making exact drawings and specifications of every part was this: Machinery of this magnitude has as yet not reached that state of perfection, and probably never will, where all builders build to any certain and fixed plan as to details. In this respect each builder has his own detailed plans, and no two are alike, and their tools and patterns are made to produce their own work after their own plans; therefore, if the detailed plans of this complicated work was to be given in all of its parts, the trustees were either compelled to adopt the plans of one of the concerns which had produced such work, or else get up a plan of the same kind of their own. It will be seen at once that the object of the law would be defeated if the board were to adopt the detailed plans of any one of the firms, for this would virtually destroy all bidding by firms other than the one whose plan was adopted, and place the trustees at the mercy of that firm. * * * This would destroy competition in bidding, the very thing the law was intended to bring about.''

In Patterson v. City of Zanesville, 42 Ohio App. 428, 182 N. E. 352, at page 354, the court said:

''Had detailed plans and specifications been adopted by council, such would virtually have destroyed bidding by firms other than the one whose specification was adopted. [Citing Ampt v. Cincinnati.]

"Where an article of a general known kind, but where the various makers thereof each have special attachments and devices, is desired to be purchased by municipal authorities, and the ordinance passed to that end is general in its description and not specific in detail as to specifications, and intelligent competitive bidding has been had, as in this case, we perceive no cogent reason why the intent and spirit of the law is not satisfied and fully served."

And in the case cited by appellants, Hoffman v. City of Muscatine, 212 Iowa 867, at page 881, 232 N. W. 430, 436, 77 A. L. R. 680, the late Justice Evans, speaking for this court, said:

"An elementary rule in the construction of statutes is that they shall be given a reasonable and not an arbitrary interpretation. When this is done, but one result, as we think, can be reached. This is an age of improvement and of progress, and courts should do nothing which will deny municipalities the right to use the most modern methods and improvements unless it is clear that the legislature so intended.

"There may be a monopoly, natural or artificial, in many of the substances which enter into a pavement. Thus there may be but one bank of sand which is available, or there may be a labor union which fixes the price of all work, or there may be patented machinery for mixing the cement, and in such cases surely no one would contend that no improvement could be made because, forsooth, no competitive bids may be made. We are well satisfied with the reasoning of Judge Cooley in the Hobart case [17 Mich. 246, 97 Am. Dec. 185], supra, and without quoting from his opinion, we adopt the reasoning thereof as being the true solution of the problem. But it is not true that there may not be competition in a patented article. This case is a demonstration that there may be. Competitive bids were received, which were not the same, but varied as above stated. The Warren Bros. Company agreed to furnish its patented material at a flat price to all bidders. The proposition was filed with the city council, and the price named. Bidders knew just what they would have to pay for the material, just as they might have known what they would have to pay for brick, sand, and cement had the pavement been made of brick. We have already set out the proposition, and need not repeat it here. Under the great

weight of authority the statute was sufficiently complied with, and there was competitive bidding. See Monaghan v. City [(Ind. App.) 75 N. E. 33; Id., 37 Ind. App. 280, 76 N. E. 424]; Bye v. Atlantic City [73 N. J. Law, 402, 64 Atl. 1056], and Hastings v. City [42 Ohio St. 585], supra; Mayor v. Flack, 104 Md. 107, 64 Atl. 702; State v. Board, 57 Kan. 267, 45 Pac. 616; Bunker v. City, 74 Kan. 651, 87 Pac. 884. Quotations from the opinions in these cases are unnecessary as they are readily accessible and fully cover the point here decided.

''The city council adopted the particular pavement after full investigation, and with the best light it could get upon the subject. Its motives are nowhere questioned, nor its purposes challenged. So far as shown, it acted with good business judgment and in full accord with the wishes of a majority of the abutting property owners. There is no claim of fraud and no implication of bad motive, and in our opinion there was all the competition which was necessary to justify the letting of the contract.''

And so in the case at bar, if the theory which the appellants now advocate were adopted, it would destroy competitive bidding, because, to specify that the various parts of the engine should be made of certain kinds of material, or under a certain code, would limit from bidding all of those manufacturers who did not use the materials specified in the construction of the various parts of their Diesel engine or the code specified. Certainly, no reasonable person reading these specifications would have any difficulty in understanding what the town of Coon Rapids desired. The manufacturers of Diesel engines did not have any difficulty, because there were several bidders besides the successful one.

■■■ II. The next error complained of is that the specifications required the bidders to specify the amount that would be deducted or additions made, for supplying specified things by way of substitution or for supplying other certain additional things.

These allowances were fully described in the specifications and simply provided, for example, that if the brick walls were not painted, the specifications calling for painted walls, the amount the bidder would deduct from the contract price was to be specified. There was no confusion, for each bidder knew

exactly what each alternative was and could figure it accordingly. Every bidder was on the same, identical basis. We find nothing wrong in this method of asking for bids, nor was this to the detriment of the bidder or the town.

■■■ III. The next error complained of is that the specifications fixed the location of the power plant and specifically designated the sum of money to be paid for the site, to wit: the amount of $1,000, the town having taken an option on a certain lot.

It appears that electric generating plants should be centrally located, as well as close to a railroad track. The object of this is that there will be a saving in the cost of construction of the transmission lines, and, being located close to a railroad track, there will be no great expense in unloading the oil that is used.

Certainly, a town has the right to say where the plant should be located. Coon Rapids specified the lot. The exercise of that choice is not subject to review by this court.

There is a claim made by appellants that the price to be paid is excessive. Evidence was offered by both sides. As usual, experts as to the value of real estate disagreed. There is no showing of any collusion or fraud on the part of the town council in specifying the location or in regard to the amount paid. All bidders were on the same basis; $1,000 was the amount which they were to include in their bids, for the site.

■■■ IV. Finally appellants contend that the town council was without authority to award a contract because no hearing had been held, as required by sections 6134-d4 to 6134-d6, which are the pertinent provisions of the Simmer law.

Section 6134-d4 is as follows:

"Notice of the proposed contract—publication. Before any municipality shall enter into any such contract as provided in section 6134-d1, for the establishment of a plant, or for the extension or improvement of an existing plant, to cost five thousand dollars or more, the governing body proposing to make such contract shall give thirty days' notice of its intention to adopt proposed plans and specifications and proposed form of contract therefor, by publication once each week for two consecutive weeks in some newspaper of general circulation in the municipality and also in some newspaper of general circulation

in the state of Iowa, the first publication of which shall be at least thirty days prior to the time of hearing fixed in said notice.''

Section 6134-d6 provides:

''Execution of contract. Pursuant to said notice and at such time and place as is fixed therein the governing body shall consider the said plans and specifications, form of contract, and offers and propositions submitted in connection therewith, also any bids for the furnishing of electrical energy, gas, water, or heat, together with any objections thereto by an interested party, and at such hearing or any adjournment thereof, shall have the power to adopt such offer or offers, propositions, or bids, and enter into such contract or contracts, as they shall deem to be to the best interest of the municipality.''

So much for the law. Now, let us see what happened at Coon Rapids.

A notice was duly published on March 27th and April 3d, in the Coon Rapids Enterprise and Des Moines Register, setting the 28th day of April, 1936, at 2 p. m., at the town hall of Coon Rapids as the time and place for the hearing. Objections were filed by some two hundred property owners, electric and water users of the town of Coon Rapids. These objectors were represented by counsel. At the hour set by the notice the members of the council and the mayor were in their respective seats in the town hall at Coon Rapids. Some of the objectors were there in person, as were their counsel. The meeting was called to order. The objections were opened, read and placed on file. Following this, Mr. Salinger, one of the attorneys representing the objectors, was given the opportunity orally to object, which opportunity he took advantage of. After he had finished—no time limit having been placed—he asked permission to offer evidence on behalf of the objectors. We quote from the record:

''L. H. Salinger, Attorney, of Carroll, Iowa, appeared as representative of the objectors and made further oral objections on behalf of his clients that the cost of the proposed site of the plant was excessive; and asked permission on behalf of the objectors to submit evidence to sustain the allegations of objections No. 1, 2, 3 and 4.''

He was denied the opportunity of submitting evidence to sustain the allegations of his objection, and this is one of the errors appellants rely upon, claiming that they had no hearing.

The property owners' objections were in writing. These people had a right to object, and they were entitled to be heard. The town of Coon Rapids gave them that right. The objectors exercised that right by filing their written objections; by employing able counsel, who went with them to the meeting and there orally objected. They then asked permission to offer evidence to sustain the allegations of their written objections.

The council knew what the objections were; it wasn't necessary to offer evidence to sustain these objections. How could a city council listen to evidence and pass upon same? Would it be required to listen to the evidence of each and every one of the two hundred objectors? Would each objector be entitled to an expert to tear apart the sixty-three page specifications and to point out wherein they were wrong? Would the council have a right to limit the evidence to one or two objectors? Could it limit the cross-examination, or was it forced to sit there and listen to the unlimited evidence which might have been offered? If it was, it would still be in session, and the abstract in this case, instead of consisting of only 531 pages, might have run a close second to the abstract of four thousand pages now on file in this court in another case.

There is nothing contained in the Simmer law that requires the hearing of evidence. If the legislature had intended that the council not only hear objections but also take evidence and hear proof with respect thereto, it would have said so, exactly as it has said in respect to other hearings. This record shows that the town council of Coon Rapids gave the right to the objectors, both in writing and orally, both in person and by counsel, to present their objections; that a full and fair hearing was given to appellants, and after same their objections were duly overruled by the town council.

█ █ █ The legislature of Iowa intended by the Simmer law to arm cities and towns with a workable plan under which such municipalities could acquire their own utilities and pay for them out of earnings. It is not for the court to say whether, as a matter of public policy, that was right or wrong. But, it is the duty of the court to give to that mandate of the legislature, speaking for the people of Iowa, a reasonable interpretation, so that its

true purpose and intent may be realized. We quote again from the late Justice Evans' opinion in Hoffman v. City of Muscatine, supra, 212 Iowa 867, at page 889, 232 N. W. 430, 440, 77 A. L. R. 680:

"If there be any question of public policy involved, as appellants contend, such policy is a legislative one. If it be a doubtful policy to permit patentees to bid at a letting, it was for the legislature to recognize that fact and to legislate thereon. The possible vice of such a practice is just as manifest to the legislative mind as to the judicial. To base judicial decision upon alleged public policy, has its peril and is done only under extraordinary circumstances."

The appellants have had a fair trial. The propositions upon which they rely have been ably presented. The trial court was right in dismissing their petition, and it necessarily follows that this case must be, and it is affirmed.—Affirmed.

RICHARDS, C. J., and ANDERSON, DONEGAN, KINTZINGER, HAMILTON, STIGER, and PARSONS, JJ., concur.

SAGER, J., takes no part.