## McCULLOCH et al. v. MUTUAL LIFE INS. CO. OF NEW YORK.
### No. 4574.

Circuit Court of Appeals, Fourth Circuit.

Feb. 26, 1940.

867

Ashton File, of Beckley, W. Va. and B. J. Pettigrew, of Charleston, W. Va. (File, Scherer & File, of Beckley, W. Va. on the brief), for appellants.

Thomas B. Jackson, of Charleston, W. Va. (Frank R. Lyon, Jr., of Charleston, W. Va., Louis W. Dawson, of New York City, and Brown, Jackson & Knight, of Charleston, W.Va., on the brief), for appellee.

Before PARKER and SOPER, Circuit Judges, and HENRY H. WATKINS, District Judge.

SOPER, Circuit Judge.

█ The Mutual Life Insurance Company of New York brought this suit against the administrator of the estate of Dr. John H. McCulloch and the beneficiaries of insurance policies on his life in the aggregate sum of $50,000, to establish the right to exhume the body of the deceased and perform an autopsy under a provision of the policies which purported to confer this right. The complaint sought to enjoin the defendants from interfering with an autopsy to be performed under such terms and conditions as the court might impose, and from instituting in the meanwhile any action on the policies for the recovery of double indemnity, and sought also a declaratory judgment, if it should be disclosed that the death of the insured did not result from bodily injury effected solely through external, violent and accidental means, that the Insurance Company was not liable for double the face of the policies. The District Judge issued the injunction as prayed, after evidence was taken, and appointed a pathologist to perform the autopsy. Execution of the order, pending this appeal, was stayed upon the filing of a bond. This court has jurisdiction at this stage of the case to entertain an appeal from the order granting the injunction by reason of the provisions of the statute, 28 U.S.C.A. § 227.

Death occurred about 6 o'clock on Saturday evening, March 18, 1939, at the Black Knight Country Club near Beckley, West Virginia, where the residence of the insured was located. He fell while descending a flight of stairs leading from the second to the first floor of the club, and the force of the fall was so great that he sustained a multiple fracture of the skull and died within eight or ten minutes. There was evidence tending to show that he caught his left heel in a tread of the stairs and was pitched forward. He was examined by a physician two minutes after the fall. The physical symptoms and conditions were such as usually follow such a fall, and the injuries were such as would naturally result in death.

The District Judge found that the fracture of the skull was the apparent cause of death, and that there was no evidence of fraud or concealment respecting the physical condition and state of health of the insured prior to or at the time of his death. He made no finding that the deceased was suffering from any disease that contributed to his death, and there was no direct evidence on the point.

The record in the District Court upon which the issuance of the injunction was based, may be summarized as follows: The insured was 53 years of age, over 6 feet tall, and weighed 195 pounds. He was a physician in active superintendence of the Beckley Hospital of 155 beds, of which he was part owner, and he was also actively engaged in other business enterprises of considerable importance. At the time of his death he was apparently in good health. The company charged that the exact cause of the death was unknown, but that there was reason to believe that death resulted directly or indirectly from disease or bodily or mental infirmity, or from the effects of intoxicating beverages imbibed by the deceased; that he had been partaking freely and to excess of intoxicating beverages on the day of his death, and in fact had been drinking to excess during the five years immediately preceding his death, during which time he gained excessively in weight. The only direct evidence offered in support of the charge related to the use of intoxicants. On this point it was shown that he did not drink during the day, but was entirely sober and competent, and gave constant daily attention to his duties as an officer of various business enterprises; that he was an occasional moderate drinker when he visited the Country Club and sometimes showed the effects of alcohol although never so much as to lose control of himself; in short, that his habits with respect to the use of intoxicants were "about the same as 90% of the people who visit Country Clubs". He had had one drink about one and a half or two hours before his fall, and was not under the influence of intoxicants at the time.

The Insurance Company offered the testimony of two medical experts of Charleston, West Virginia, one of whom was a medical referee in its employ, and the other a pathologist who was accustomed to perform autopsies. Neither of them had examined the insured or had any personal knowledge of his physical condition or state of health at the time of the fall or the injuries then sustained. Each of them was asked and permitted to answer the following question without reference to any facts with respect to the physical condition or state of health of the insured other than is contained in the question itself, namely: Doctor, assuming that the deceased, Dr. John H. McCulloch fell downstairs at the Black Knight Country Club in Beckley and sustained a fracture of the skull and died within 8 or 10 minutes thereafter; that Dr. McCulloch was a man 53 years of age at the time of his death; was a large man, 6 feet or 6 feet 2 inches tall, and weighed around 195 pounds; I want to ask you what is the possibility, in your opinion as a physician, that Dr. McCulloch may have died from one of the following causes: 1. A coronary occlusion. 2. An arterial aneurism. 3. An apoplexy. 4. An internal hemorrhage from an ulcer or from cirrhosis of the liver; or that one of those causes may have contributed directly to his death? The answer in each case was that death from one of the enumerated causes was possible. The experts also testified that the use of alcoholic drinks by the insured preceding death would increase the likelihood that one of the enumerated causes contributed to his death—the greater the use, the greater the likelihood—and that the only method of ascertaining whether one of the enumerated diseases was a contributing cause of death was by an autopsy.

One physician who appeared on behalf of the policy holders testified that he examined the insured two or three minutes after the fall and before his death, and found conditions inconsistent with either a coronary occlusion or an arterial aneurism. In his opinion, the cause of death was clearly a brain hemorrhage induced by the fracture. Of the five other physicians who examined the body the same evening, two were x-ray specialists and testified as to the fracture; the remaining three were of the unanimous opinion that the fracture caused the death. It was also shown that an apoplexy could not be determined by an autopsy in this case because the fracture had caused a brain hemorrhage of sufficient severity to obliterate traces of any hemorrhage caused by apoplexy. No evidence was offered to indicate that the deceased had ever suffered with any of the four dis-

eases mentioned in the hypothetical question above set out.

The Sunday newspapers carried conflicting accounts of the accident, one paper attributing death to the fall, and another, to heart disease, although the record contains no evidence tending to indicate the latter. The Charleston agent, who solicited the policies, read these reports, and wired and wrote the State office of the Company at Wheeling on Sunday, asking for blanks for proof of death. A discussion of the newspaper stories took place by telephone on Monday between him and the agent in Wheeling. A prompt investigation was advised, and on Monday the soliciting agent communicated with the administrator who explained the facts surrounding the death of the insured and indicated that if an autopsy was to be performed, it would have to be done prior to the burial, which was fixed for Tuesday afternoon, as the widow would not consent to an autopsy after the interment. The agent expressed the opinion that the Company would not require an autopsy. No investigation was initiated by the Company before burial to ascertain the cause of death. Proofs of death were sent to the home office of the Company on March 29. On April 3, 1939 the Company requested the widow to permit it to make an autopsy, calling attention to the provision of the policy with regard to an autopsy. The request was refused upon the ground that the Company had had an opportunity to make the autopsy before burial and had not availed itself thereof.

The policies in suit contained the following provision: "The Company shall have the right and opportunity to examine the body and to make an autopsy unless prohibited by law". Similar provisions in life and accident policies have been considered by the courts during the past forty years and for the most part have been strictly construed. This attitude has been deemed just, not only because the policy provision is phrased by the insurer for its own benefit and may be invoked as a condition precedent to work a forfeiture and defeat recovery, but also because an unnecessary or unreasonable exercise of the right of autopsy entails a course of action that is abhorrent to the sensibilities of surviving relatives and may involve a desecration of the grave. Some decisions have gone so far as to say that if the policy does not give the insurer the right to perform an autopsy after interment, the right is lost unless the autopsy is demanded and performed before interment, and that if the insurer desires to secure the practicable exercise of the privilege, it must arrange to secure information of the death before the interment takes place. United States F. & G. Co. v. Hood, 124 Miss. 548, 87 So. 115, 15 A.L.R. 605; Provident Life & Accident Ins. Co. v. Campbell, 18 Tenn.App. 452, 79 S.W.2d 292; Cantrall v. Great American Cas. Co., 256 Ill.App. 47.

The general current of authority, however, does not go to this extent. It is generally held that the right may not be exercised after burial if it was reasonably possible for the insurer to secure the privilege before that event. But the insurer may have been denied an autopsy before burial, or may have had no notice or insufficient notice of the death until after the interment; or circumstances, such as fraud or mistake or uncertainty as to the true cause of death that make an autopsy reasonably necessary to the ascertainment of the truth may not have become known to the insurer until after the burial, notwithstanding the exercise of due diligence on its part. Under such circumstances, an autopsy ought not to be arbitrarily withheld, and the decisions so hold. See, Whitman v. Kentucky Central Life & Acc. Ins. Co., 232 Ky. 173, 22 S.W.2d 593; Hurley v. Metropolitan Life Ins. Co., Mass. 5 N.E.2d 16; Sheehan v. Commercial Travelers' Mut. Acc. Ass'n, 283 Mass. 543, 186 N.E. 627, 88 A.L.R. 975; Gould v. Travelers' Ins. Co., 244 App.Div. 274, 279 N.Y.S. 892; Painter v. United States F. & G. Co., 123 Md. 301, 308, 91 A. 158.

While it is difficult to lay down a rule generally applicable under all circumstances, it is safe to say that two conditions at least must concur to justify an autopsy after burial. It must appear that through no fault of the insurer it was impracticable to demand and perform the autopsy before interment, and secondly, it must be reasonably certain that an examination of the body will reveal something bearing on the rights of the parties which could not otherwise be discovered. Massachusetts Bonding & Ins. Co. v. Duncan, 166 Ky. 515, 179 S.W. 472; Grangers' Life Ins. Co. v. Brown, 57 Miss. 308, 34 Am.Rep. 446; Johnson v. Bankers' Mut. Cas. Ins. Co., 129 Minn. 18, 151 N.W. 413, L.R.A.1915D, 1199, Ann.Cas.1916A,

154; American National Ins. Co. v. Nuckols, 1916, Tex.Civ.App., 187 S.W. 497; Rinaldi v. Prudential Ins. Co., 118 Conn. 419, 172 A. 777; General Acc. Fire & Life Assur. Corp. v. Savage, 8 Cir., 35 F. 2d 587; Clay v. Ætna Life Ins. Co., D.C. Minn., 53 F.2d 689; Howes v. United States F. & G. Co., 9 Cir., 73 F.2d 611; Travelers Ins. Co. v. Welch, 5 Cir., 82 F.2d 799.

The general principles involved are summed up in Wehle v. United States Mut. Acc. Ass'n, 153 N.Y. 116, 122, 47 N.E. 35, 36, 60 Am.St.Rep. 598, as follows: "The provisions as to the examination of the person or body of the insured was not only expressly assented to by the insured when he made application for the insurance, and therefore should be given effect as his express agreement, but it was a reasonable provision, and quite necessary in accident insurance, as affording a protection against fraud. * * * The effect of the giving of immediate notice was to impose upon the defendant the obligation immediately to make such investigation of the occurrence as to enable it to decide whether to insist upon its right to an examination of the body in order to satisfy itself as to the cause of the death. It was not at liberty to wait indefinitely, or for any unreasonable length of time. The provision, though not, as before observed, of an unreasonable nature, nevertheless was one which, in the nature of things, called for prompt action on the part of the insurer. Although no time is specified within which the permission to examine may be availed of, still a due regard for the sentiments of the family and friends of the deceased, if not public policy, required as immediate an exercise of the option to examine as was possible. Conditions in insurance policies, as in all other contracts, should be construed strictly against those for whose benefit they were reserved. Paul v. Travelers' Ins. Co., 112 N.Y. 472, 20 N.E. 347 [3 L.R.A. 443, 8 Am.St.Rep. 758]. * * * We do not think that there was any ambiguity with respect to the permission to examine the person or body of the insured, and if it should appear in any case that at some subsequent date, after the interment of the body, circumstances or facts coming to the knowledge of the insurer warranted a reasonable belief that death was occasioned by means or causes excepted from the contract of insurance, a reasonable construction of this provision would authorize the insurer to insist upon an exhumation of the body and upon a dissection of it."

In the pending case the District Judge found that one day only was available to the insurer between the death and the burial, and that this was insufficient to permit an investigation, and that the demand for an autopsy, two weeks after the death of the insured, was made within a reasonable time. The judge also found that the insurer had reasonable ground to believe that an autopsy might disclose such a cause or contributing cause of death as would demonstrate that it was not accidental within the meaning of the double indemnity clause of the policies. Opinions may differ as to whether the period which elapsed after the insurer had knowledge of the death gave sufficient time before interment for a decision upon the necessity of an autopsy. But we need not decide this point, for in our opinion the insurer failed to show that it had reasonable ground to believe that death was not purely accidental within the meaning of the policies. All of the evidence tended to show that the insured was killed by the fall, and there was no evidence whatsoever to indicate that he was afflicted by any disease at the time of the accident. The evidence of the insurer's experts tended to show that one who uses intoxicants is more likely to suffer from the ailments enumerated in the hypothetical question than one who does not; but whether or not a moderate drinker has in fact a serious disease at any particular point of time remains a question of fact which is not solved by merely showing that he is a user of alcoholic drinks. The hypothetical question made no reference to the habits or health of the deceased, and elicited no other information than that if one falls down a flight of stairs, fractures his skull and dies in eight minutes, his death may possibly have been caused wholly or partly by disease. The possibility alone may furnish support for a guess or a conjecture, but it does not amount to proof. Two weeks elapsed after the accident and before the insured demanded an autopsy. Two additional months passed by before the pending suit was brought, and another month before the hearing took place. Nevertheless no evidence whatever was produced to show that the insured was afflicted with disease at the time of the accident. The only fair inference is that the insurer

has no basis for its assertion that disease was a contributing cause of death, but only a hope that in the course of the investigation something may be revealed that will relieve it from the double liability. Our conclusion is that it would not be reasonable under the circumstances to compel the representatives of the deceased to allow an autopsy, and that the injunction should have been denied.

Reversed.