IN RE PROPOSED DISINTERMENT OF FRED J. JARVIS.

No. 48247.

(Reported in 58 N.W.2d 24)

April 8, 1953.

Rehearing Denied June 12, 1953.

Life & Davis, of Oskaloosa, for appellant.

Lehmann, Hurlburt, Blanchard & Cless, of Des Moines, appellee pro se.

Garfield, J.—Attorneys representing Mutual Benefit Health and Accident Association (herein called "the company") filed in the district court of Mahaska County application under sections 141.22 to 141.25, Code, 1950, for an order for disinterment of the dead body of Dr. Fred J. Jarvis for the purpose of holding an autopsy. The application was resisted by Doctor Jarvis's widow. After hearing evidence offered by both applicant and resister the district court granted the application and Mrs. Jarvis has appealed to us.

Decedent, a retired physician, age 77, was injured in an automobile accident on January 20, 1952. His right leg was broken at the knee, his right arm and shoulder and the right side of his chest were bruised and perhaps otherwise injured. The following day he was taken to a hospital in Iowa City where he died at 12:47 p.m., January 24. That afternoon his body was returned to Oskaloosa where it was embalmed by a licensed embalmer in late afternoon or early evening. He was buried January 28.

The widow is beneficiary in two accident insurance policies for a total amount of $12,250. One policy was issued by the company represented by applicant, the other was assumed by it. The former policy insures against loss of Doctor Jarvis's life, limb, sight or time resulting directly and independently of all other causes from bodily injuries sustained through purely accidental means. Terms of the other policy are generally similar.

The certificate of death made by Dr. Arthur Steindler, attending physician, gives "cerebral hemorrhage" as the condition directly leading to Doctor Jarvis's death and gives no antecedent causes. Doctor Steindler's signed statement, part of the beneficiary's proof of claim furnished the company, states "cerebrovascular accident" was the primary cause of death, and "pneumonitis" was the secondary or contributing cause. The former term is the substantial equivalent of cerebral hemorrhage and does not mean a traumatic injury. Pneumonitis is another name for pneumonia.

The beneficiary contends and the company denies death was accidental within the meaning of the policies. On June 16, 1952, the company commenced action against Mrs. Jarvis in the United States District Court at Ottumwa asking that its liability and the beneficiary's rights under the policies be declared and adjudged. In this action the company contends it is liable only for accidental disability benefits and not for insured's death.

While this application for disinterment was pending Mrs. Jarvis commenced action against the company in the district court of Mahaska County to recover the full amount of the policies on account of her husband's death. This action was transferred to the United States court and consolidated with the action there commenced by the company. The consolidated causes remained undisposed of when the disinterment application was heard and decided in September 1952.

Section 141.22, Code, 1950, states: "Disinterment for autopsy. No person shall disinter the dead body of a human being for the purpose of holding an autopsy thereon in order to determine the cause of death without obtaining for that purpose either:

"1. An order of the district court of the county in which the body is buried, or

"2. A special permit from the state department of health."

Section 141.24 provides: "Application for court order. An application for a court order for a disinterment for the purpose of holding an autopsy may be made by the county attorney, coroner, or any attorney representing any party in any criminal or civil proceedings. * * *."

Section 141.25 states: "Granting of application. No application for a permit to disinter for the purpose of holding an autopsy shall be granted * * * except under circumstances such as to cause the belief that someone is criminally or civilly liable for such death. A proper showing shall be made in every case and due consideration shall be given to the public health, the dead, and the feelings of relatives and friends. * * *."

In re Disinterment of Tow, 243 Iowa 695, 53 N.W.2d 283, a proceeding like that now before us, considers these statutes and holds our review of such a proceeding is not de novo but is rather "somewhat in the nature of certiorari." Pursuant to this Tow decision counsel for appellant, Mrs. Jarvis, conceded upon submission of this appeal it is not reviewable de novo and if there is competent evidence to support the trial court's findings they are conclusive upon us. The Tow case also holds (at page 700. of 243 Iowa, page 286 of 53 N.W.2d) : "It is sufficient to show there is reasonable likelihood that an autopsy would either confirm or negative the claim of the insurer-applicant." The cited case affirms an order for disinterment although some questions were there raised by the widow which we do not have here.

I. The trial court found there is reasonable likelihood an autopsy would determine the cause of death and thereby confirm or negative the respective claims of the litigants. Appellant argues in substance no proper showing was made that warrants this finding. We think, however, there is substantial evidence to support the finding and it is therefore conclusive upon us.

Appellee offered the testimony of Doctor Birge of Des Moines, a pathologist of wide experience. Appellant offered the

evidence of Doctor Phelps of Ottumwa, apparently younger and less experienced. The testimony of each witness fills some sixty pages of the record. We shall not attempt to review it. It is apparent Doctor Birge feels it is reasonably probable an autopsy would disclose the condition that caused decedent's cerebral hemorrhage. In effect he so testifies more than once.

Doctor Phelps expresses the opinion an autopsy would not in all probability establish the cause of death. "I doubt very seriously that an autopsy at this time would be conclusive." However, Doctor Phelps admits in effect that if the embalming was adequate the autopsy would probably reveal any one of several recognized causes of cerebral hemorrhage such as brain tumor, arteriosclerosis, and traumatic injury to the brain. He also admits in substance that autopsies are very frequently performed for the purpose of determining the cause of death of persons who die under somewhat similar circumstances and says it would be advisable to have an autopsy upon one who dies from cerebral hemorrhage with no clinical symptoms present. Near the end of his cross-examination Doctor Phelps concludes it is very definitely possible an autopsy could show the cause of death.

Much of appellant's argument as to the claimed lack of evidence to support the trial court's finding is based on some of the cross-examination of the undertaker who did the embalming. He testifies on direct examination by appellee that he is a licensed embalmer and followed the usual procedure of embalming here. On cross-examination he says in part Doctor Jarvis's "circulation wasn't what I would call real good. * * * I wouldn't say we had a good embalming job." He adds that deterioration or decomposition of the body would be more rapid than if there was a good embalming job.

However, the undertaker testifies on redirect examination that the embalming fluid was inserted into the carotid artery which directly serves the.brain and he has no way of knowing that a satisfactory job of embalming was not done in the brain. Appellant's witness Doctor Phelps testifies he would not say Doctor Jarvis's leg fracture would obstruct circulation of the embalming fluid—it would require only entering the blood ves-

sels beyond the fractured place. He also says there would be no reason to question the circulation through the brain of embalming fluid inserted into the carotid artery.

We deem further discussion of the evidence unnecessary.

II. Appellant contends appellee's application should have been denied because it is said to be unreasonable and not seasonably made. The contention cannot be sustained under the circumstances here.

There are several answers to appellant's argument the company should have asked for an autopsy before burial. The policies are not before us. There is no evidence either policy gives the company any right to an autopsy at any time. It seems apparent any request by the company for an autopsy would probably not have been granted. Appellant did not furnish the company a claim for accidental death benefits until about February 22, 1952 (burial was on January 28). So far as shown this claim is the first information the company had that death was caused by cerebral hemorrhage. Before then there was no reason for the company to doubt that death was accidental and hence no reason to seek an autopsy.

This application was filed under Code sections 141.22 et seq. Unless such an application is made by the county attorney or coroner it may be made only by an "attorney representing any party in any criminal or civil proceedings." (Section 141.24.) It is apparent from these statutes and In re Disinterment of Tow, supra, 243 Iowa 695, 53 N.W.2d 283, that the proceedings referred to are those which involve the cause of death. Such proceedings are frequently not commenced until at least some little time after death.

Here no such proceeding was started until the company commenced its action in the federal court on June 16, 1952. Before then no one representing the company was entitled to apply for a court order for disinterment. Appellant commenced no action against the company until after this application was filed on July 8.

This application was set for hearing July 22 but appellee was unable to get service of notice upon appellant because of her absence from the jurisdiction, and the hearing was not held until September 10 and 11. The matter was promptly decided.

After the appeal to this court, one of the justices issued a stay order on October 13 which appellee resisted. Any delay that occurred after this application was filed seems not to be chargeable to appellee.

One of the principal reasons for resisting this application is, in appellant's words, "I just don't like the idea" of an autopsy. This objection, which is of course understandable, would seem to have no stronger appeal than if the application had been filed earlier. In re Disinterment of Tow, supra, 243 Iowa 695, 53 N.W.2d 283, considers an application for disinterment filed about three months after death where the widow had promptly commenced what we there hold was a civil proceeding involving the cause of death. As previously stated we affirmed the order for disinterment.

Our statutes fix no time limit for filing such an application. We should not write one into the statutes here. Conceding any right to a court order for disinterment may be lost by unreasonable delay in applying for it, there is insufficient basis for reversing this order on the ground there was such delay here.

 The public policy of this state in the matter of disinterment has been declared by the legislature in the above statutes and it is our duty to take them as we find them. See State v. Bruntlett, 240 Iowa 338, 355, 356, 36 N.W.2d 450, 460 ("The legislature, and not this court, declares the public policy of this state. * * * We are limited both by law and conscience to the judicial function of faithfully interpreting and applying the law as we find it."); Vilas v. Board of Assessment and Review, 223 Iowa 604, 620, 273 N.W. 338; Brutsche v. Coon Rapids, 223 Iowa 487, 501, 502, 272 N.W. 624; Kuhn v. Kuhn, 125 Iowa 449, 453, 101 N.W. 151, 2 Ann. Cas. 657; 11 Am. Jur., Constitutional Law, section 139, page 815 ("* * * the rule has become securely settled that all questions of policy are for the determination of the legislature, and not for the courts."); 16 C. J. S., Constitutional Law, section 154, page 477.

Appellant cites Robertson v. Mutual Life Ins. Co., 232 Iowa 743, 755–757, 6 N.W.2d 153, 159, 160; United States F. & G. Co. v. Hood, 124 Miss. 548, 87 So. 115, 15 A. L. R. 605, and annotation 614; McCulloch v. Mutual Life Ins. Co. of New

1032

York, 4 Cir., W. Va., 109 F.2d 866; annotation 88 A. L. R. 984; 29 Am. Jur., Insurance, sections 1128, 1129, for the proposition a demand for an autopsy must be reasonable and seasonably made. We have carefully considered these and like authorities. We find no fault with them but they have little application here.

The cited authorities consider policy provisions for an autopsy where it is sought to avoid liability on the policy because of refusal. to grant the insurer's request for an autopsy. Such policy provisions are construed most strongly against the insurer, courts are slow to hold a policy is forfeited by refusal to consent to an autopsy and sometimes reject such a contention on the ground the demand for the autopsy was unreasonable or not seasonably made.

III. The trial court's order provides the pathologist who performs the autopsy "may remove such organs or parts of organs from the body * * * as may be required to effectively perform such autopsy, provided, however, such organs or parts of organs so removed, *except only such portions thereof as may be necessary to be subjected to microscopic examination,* shall be restored to their normal place in the body prior to reburial."

Appellant contends chapter 141 does not authorize a party to remove *and retain* any organ or part of a body. The only portion of the order which could be vulnerable to this contention is that italicized by us. Doctor Birge testifies if he were to perform the autopsy it would be his purpose to shave the brain and also to keep some slivers of tissue for microscopic examination. In making the part of the order we have italicized the trial court evidently had in mind this testimony.

All appellee claims for the italicized provision is that it relieves the pathologist from any duty to replace shavings or slivers of tissue necessary to subject to microscopic examination. To remove any doubt in this regard, however, the trial court's order is hereby modified by striking therefrom the above quoted italicized language and inserting in lieu thereof: "except only shavings or such slivers of tissue as may be necessary to subject to microscopic examination."

The rest of the order is proper. Code sections 141.22 et seq. provide for an autopsy in order to determine the cause of death.

"Autopsy" has a recognized meaning. Webster's New International Dictionary, Second Ed., defines it as "Inspection, and usually partial dissection, of a dead body which has been opened so as to expose important organs either to ascertain the cause of death, or, if this is known, the exact nature and extent of the lesions of the disease, and any other abnormalities present; * * *."

Painter Fertilizer Co. v. Boyd, 93 Fla. 354, 359, 114 So. 444, 445, states, "An autopsy is a post-mortem examination, a dissection of a dead body to determine the cause, seat or nature of the disease; * * *." 7 C. J. S., page 1298, says autopsy is "An examination of a dead body by dissection, to ascertain the cause of death; * * *."

The testimony of both Doctors Birge and Phelps indicates an autopsy has a recognized meaning among pathologists and it includes removal and replacement of organs and at least partial dissection thereof if reasonably necessary to ascertain the cause of death. The order here as above modified is within the recognized definitions, lay, legal and medical, of autopsy.

Winkler v. Hawkes & Ackley, 126 Iowa 474, 477, 478, 102 N.W. 418, 419, tends to support our conclusion. We there held a widow's consent to a post-mortem examination for the purpose of ascertaining the cause of death implies "a permission to the surgeons to conduct such examination in the approved and usual manner practiced by their profession; and, if the removal of some of the organs for microscopic examination was necessary or proper to effect the purpose of the post-mortem, then the defendants would not be guilty of an actionable wrong in so doing, unless such permission was expressly withheld * * *."

Robertson v. Mutual Life Ins. Co., supra, 232 Iowa 743, 757–759, 6 N.W.2d 153, 159, 160, cited by appellant, is not in point. There the insurer sought to avoid liability on the policy because of the widow-beneficiary's refusal of its demand for an autopsy and permission to remove from the body "and to retain such organ or organs or other portions of the body as may be necessary." We held this defense to the policy was not good because the demand was unreasonable and exceeded the policy provision for an autopsy. It is apparent such demand

1034

went much further than the court's order here. And, as previously explained, we are not now concerned with a policy provision construed most strongly against the insurer.

IV. The record does not support appellant's complaint that the trial court did not give due regard to the feelings of the family and friends and the public health.

Code section 141.25, above-quoted, requires that "due consideration shall be given to the public health, the dead, and the feelings of relatives and friends." There is no indication it will adversely affect the public health to carry out the trial court's order. The court evidently considered very carefully the feelings of relatives and friends who are naturally reluctant to have decedent's body disinterred. Its Conclusions of Law state: "* * * the Court is not unmindful of the very natural feeling of abhorrence that exists in the minds of the widow and relatives * * * to the proposed disinterment and autopsy, but in circumstances such as here present there is an overriding and overpowering consideration. The quest of the law is ever to ascertain the very truth, and where a means is provided which is reasonably calculated to aid in such quest, the feelings and sentiments of the individual, however sincere and justifiable they may be, cannot be interposed to defeat the ascertainment of the truth. The Court has given due consideration to the feelings of the widow and relatives and as against a natural reluctance on its part to disturb the quiet and sanctity of the grave, has been compelled to conclude that the exercise of 'a sound legal discretion' requires granting the application."

In re Disinterment of Tow, supra, 243 Iowa 695, 700, 701, 53 N.W.2d 283, 286, considers "the universal sentiments and feelings of mankind as to their dead" and holds, "Our statute has carefully defined the limits within which our legislature thought those sentiments should be disregarded. * * * The result reached has the advantage that its effect is to broaden rather than narrow the search for truth as to the cause of death—a tendency to reveal rather than conceal possible facts bearing on the respective rights of the parties."

In some instances court orders for disinterment and an autopsy, even without statutory authorization, have been upheld

where they are essential to the demands of justice, notwithstanding objections of relatives, "* * * the right to have the body remain undisturbed * * * is not absolute, and must yield where * * * the demands of justice require such subordination." 25 C. J. S., Dead Bodies, section 4b, page 1023. See also Kusky v. Laderbush, 96 N. H. 286, 74 A.2d 546, 21 A. L. R.2d 536 (where it was held unreasonable to deny a litigant's motion for an autopsy under proper safeguards), and annotation 538; Gray v. State, 55 Tex. Cr. App. 90, 114 S.W. 635, 22 L. R. A., N. S., 513, 521; Painter v. United States F. & G. Co., 123 Md. 301, 91 A. 158, 160; Ullendorff v. Brown, 156 Fla. 655, 24 So.2d 37, 40; Mutual Life Insurance Co. of New York v. Griesa, C. C., Kan., 156 F. 398; 15 Am. Jur., Dead Bodies, section 19.

Wigmore on Evidence, Third Ed., section 2221, pages 210, 211, states: "The *exhumation* or the *autopsy of a corpse,* when useful to ascertain facts in litigation, should of course be performed. Reverence for the memory of those who have departed does not require us to abdicate the high duty of doing justice to the living * * *." See also Id., section 2216(*d*), page 170. Idem, note 4, section 2221, page 210, and the additions thereto in the 1951 Pocket Supplement summarize decisions and statutes on the right to an autopsy.

Appellant's remaining claim of error is largely a combination of those previously considered and requires no further discussion.

We hold the trial court's order as modified in Division III hereof is not erroneous in any respect urged by appellant. As so modified it is affirmed.—Modified and affirmed.

SMITH, C. J., and BLISS, WENNERSTRUM and LARSON, JJ., concur.

THOMPSON, OLIVER, MULRONEY, and HAYS, JJ., dissent.

THOMPSON, J. (dissenting)—Not being persuaded of the soundness of the majority opinion, I respectfully dissent therefrom. We upheld the right to disinterment of J. Basil Tow, 243 Iowa 695, 53 N.W.2d 283. Although only a minimum majority of this court—five—joined in the opinion, it must be recognized as the settled law of the state, so far as it applies.

I. But there is a different and, it seems to me, a vital issue present in the case at bar which was not decided in the Tow case. The appellant here contends that the application for disinterment and for an autopsy was not seasonably or reasonably made. Doctor Jarvis was injured on January 20; he died on January 24, and was buried on January 28. Before he died the Des Moines office of the Mutual Benefit Health & Accident Association of Omaha, Nebraska, the applicant for disinterment herein, was advised of the accident, and its Oskaloosa agent was notified on January 25. Proof of loss, with claim for accidental death benefits and showing the primary cause of death as a cerebral hemorrhage, was furnished the insurer on February 22. Its action in the federal court was commenced on June 16 next, and this application for disinterment on July 8. These dates are important upon the question of the reasonableness and seasonableness of the application.

One of the ways in which the majority excuses the insurer for failing to make a prompt application for an autopsy is that "so far as shown this claim [appellant's proof of loss given the company on February 22] is the first information the company had that death was caused by cerebral hemorrhage." But the company did know of the death of Doctor Jarvis, and that it had occurred following an automobile accident. Surely it had an obligation to make its own investigation. Under similar circumstances the New York Court of Appeals said in Wehle v. United States Mutual Accident Association of the City of New York, 153 N. Y. 116, 122, 47 N.E. 35, 37, 60 Am. St. Rep. 598, 599:

"The effect of the giving of immediate notice was to impose upon the defendant the obligation immediately to make such investigation of the occurrence, as to enable it to decide whether to insist upon its right to an examination of the body in order to satisfy itself as to the cause of the death. It was not at liberty to wait indefinitely, or for any unreasonable length of time."

It is true that it cannot be urged here that the insurer should have made its application before the burial. Our statute permits these applications only when there is a proceeding pending, and it can hardly be expected that litigation will develop before the

dead man is in his grave. But, even if the insurer-applicant here had been under no duty to investigate or to proceed until it had been advised by some outside source that there was a question as to the cause of death, it had such knowledge on February 22. It did not file its application for disinterment until July 8, some four and one-half months later. Of course it may be contended that it could not file its application until there was a proceeding pending. The "proceeding" which was pending when it finally filed its application was its own suit in federal court. This it might have filed at any time. Can it be fairly said that by withholding its suit to establish its nonliability on the policy, it thereby extended its time for filing a reasonable application for disinterment? The question is self-answering. Under the authorities it was the duty of the insurer to make timely application. A waiting period of over five months from the date of death and over four months from the time of knowledge of a possible defense seems to me to be beyond reason in this class of cases.

The majority says the cases which hold the right is lost by undue delay are not in point because the insurer was proceeding under the Iowa statute rather than claiming the right of autopsy under a provision of its policy. I am unable to distinguish the reasoning of these authorities, on principle. The disinterment of a dead body for the purpose of permitting someone who may be liable for the death to determine if a possible defense exists is abhorrent at any time. There is at least as much to be said for the insurer whose rights are based on contract as for him whose right to disinterment is statutory.

The majority says the statute fixes no time for filing the application, and we should not write one into it. It is said in Wehle v. United States Mutual Acc. Assn., supra, page 122 of 153 N.Y., page 37 of 47 N.E.: "The provision, though not, as before observed, of an unreasonable nature, nevertheless was one which, in the nature of things, called for prompt action on the part of the insurer. *Although no time is specified within which the permission to examine may be availed of, still, a due regard for the sentiments of the family and friends of the deceased,* if not public policy, *required as immediate an exercise of the option to examine as was possible.*" (Italics ours.) This was quoted with

approval in McCulloch v. Mutual Life Ins. Co. of New York, 4 Cir., W. Va., 109 F.2d 866, 870.

If it is abhorrent to permit the insurer or other applicant who conceives that his lawsuit may be aided by a disinterment to wait for many months before filing his request, and if it is the law that such request should be made within a reasonable time, I do not see why it matters whether he bases his claim upon a provision in a policy of insurance or upon a statute. Section 141.25, set out in the majority opinion, concludes with this: "A proper showing shall be made in every case and due consideration shall be given to the public health, the dead, and the feelings of relatives and friends." The majority suggests that the feelings of the relatives and friends will perhaps be the same, no matter when the application is made or how long it is delayed. It may be conceded that no relatives, or friends, are apt to like the idea of a disinterment and a dissection of the body of a loved one, at any time; but the authorities above set forth, and many others, hold that it is particularly abhorrent when the application is long delayed.

Especially is this true when the reasons for the delay may be suspect. It is pleaded by the resister, Doctor Jarvis's widow, that during the time that elapsed after his death and the date of filing of the application, negotiations for settlement were under way. It is alleged, and not denied, that the insurer offered the sum of $9000 in settlement of the claim under its policies, under which the beneficiary claimed $12,250. Quite evidently it was not until it had failed to effect a settlement at a substantial reduction from the face of the policies that it resorted to the disinterment statutes. As the majority says, the statutes do not fix any time within which the application should be made. Yet I do not think the legislature intended their use should be resorted to only after unnecessary delay and after efforts to secure a reduction in liability have failed. The construction put upon the statutes by the majority opens the door to their use by those claimed to be "liable for the death" as a club to force a favorable settlement. No one doubts the dislike of the family for the disinterment and cutting-up of the body of a loved one. It is, at best, a ghoulish proceeding which should be tolerated only when it is resorted to promptly, when it is free from any taint of improper use for settlement purposes, and when the ends

of justice clearly demand it. I think a proper interpretation of our statutes and consideration of the authorities show that all of these elements should be required before an order of disinterment is made. The majority concedes the right may be lost by undue delay; I think such delay appears here.

II. Under the rule adopted in the Tow case we are not permitted to review the findings of fact made by the trial court, if there is any substantial evidence to support them. Yet I cannot refrain from commenting upon the evident disregard of that part of the statute which requires that "due consideration shall be given to * * * the dead, and the feelings of relatives and friends." True, the trial court paid lip service to this "feeling of abhorrence", but found that there was "an overpowering and overriding consideration." This consideration was the claim of the applicant-insurer that an autopsy might be expected to show the cause of death.

It is not a case where the "feelings" of the parties, their elation at victory, their depression in defeat, their like or dislike of the outcome of the case, must be disregarded by the court. Ordinarily it is the duty of the court to put aside all consideration of these matters and to decide the case according to the law and the evidence. But here "consideration of the feelings" of the family and friends of the dead is made a part of the statute. It is the court's duty to take them into account.

It is evident the court gave no substantial weight to the feelings of the family; they weighed not at all as against the need of the applicant to find some evidence bearing on the cause of death. I suggest that that part of the statute which requires due consideration be given to the dead and the feelings of relatives and friends is fully as important as the commercial aspects of the problem, and that only the strongest showing of necessity should "override" it.

III. If, however, as the majority opinion permits, the body of Doctor Jarvis is to be disinterred, I think the extent of the autopsy is still not strictly enough limited. The only evidence of a cause of death other than the accident is found in the death certificate which lists cerebral hemorrhage as the primary cause. Dr. R. F. Birge, the pathologist who was the chief witness for the company, was asked this question:

"If an autopsy upon the cranial matter of Dr. Jarvis's body would fail to reveal any pathological condition would further exploratory post-mortem techniques be recommended to find out the cause of death?" He answered:

"If the pathologist is asked to make an examination of the body to determine the cause of death it is best not to restrict the examination. He needs to have all of the facts if he is to give an opinion as to the probable cause of death. In this case of Dr. Jarvis, suppose that no hemorrhage were found in the brain it would then be the task for a pathologist to look elsewhere if he were permitted by the order to do so to find out if there are other important conditions either related to the accident or unrelated to the accident might exist. Heart condition, an embolism to the pulmonary arteries, something of that sort."

What the doctor is asking here, and what the court gave him, is carte blanche to go through the entire body. The insurer claims there is some evidence, through the death certificate, that death was caused by a cerebral hemorrhage unrelated to the accident. There is no evidence of any other probable cause of death; that is, the showing so far as the record here goes is negative except for the accident and the brain hemorrhage as causes. In McCulloch v. Mutual Life Ins. Co. of New York, supra, page 869 of 109 F.2d, the court said: "* * * two conditions at least must concur to justify an autopsy after burial. * * * secondly, it must be reasonably certain that an examination of the body will reveal something bearing on the rights of the parties which could not otherwise be discovered." Measured by this yardstick, there is nothing here which would justify an autopsy on the body of Doctor Jarvis other than on the brain. The applicant and its doctor do not contend that they have any evidence of any cause of death other than the cerebral hemorrhage, or that it is necessary to examine other parts of the body in searching therefor. As I read Doctor Birge's testimony he wishes, if he can find nothing in the brain, to be given the right to hunt through and dissect other vital organs to see what a search there might disclose. There is no evidence to sustain such an extension of the autopsy. I would reverse.

OLIVER, MULRONEY and HAYS, JJ., join in this dissent.