COURT OF CHANCERY
OF THE
STATE OF DELAWARE

ABIGAIL M. LEGROW
MASTER IN CHANCERY

NEW CASTLE COUNTY COURTHOUSE
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

Submitted:  August 12, 2015
Final Report:  November 24, 2015

Ms. Mary L. Rinnier
301 Feryn Farms Drive
New Castle, DE 19720

Somers S. Price, Jr., Esquire
Potter Anderson & Corroon LLP
1313 N. Market Street, 6th Floor
P.O. Box 951
Wilmington, DE 19899

Suzanne I. Seubert, Esquire
Suzanne I. Seubert, P.A.
1328 King Street
Wilmington, DE 19801

>        Re:    *Mary L. Rinnier, Administratrix v.*
>               *Gracelawn Memorial Park Inc., et al.*
>               C.A. No. 6473-ML

Dear Counsel and Ms. Rinnier:

The petitioner filed this action seeking disinterment of the corpse of her daughter, who passed away and was buried more than seven years ago.  Although an autopsy was performed by the Florida medical examiner a day after her daughter's death, the petitioner believes that her daughter's death was not the result

of an accident or suicide, but rather a murder committed by the respondent, who was married to the petitioner's daughter. The petitioner hopes a second autopsy on her daughter's remains will reveal how her daughter died.

This case is difficult for many reasons, not the least of which is the petitioner's understandable grief, and even suspicion, which alone are enough to prompt my sincere sympathies. It would be tempting to grant the petitioner the relief she seeks on the off chance it will bring her clarity and closure. Unfortunately, but for good reason, there is a high standard a party must meet before this Court will order exhumation of a corpse so an autopsy may be performed. I do not believe the petitioner has come close to meeting that standard. I therefore recommend that the Court deny the petition to remove the corpse. This is my final report.

## BACKGROUND

These are the facts as I find them after trial. The petitioner, Mary L. Rinnier ("Ms. Rinnier"), is the mother of Laura Bowdoin ("Mrs. Bowdoin"). Mrs. Bowdoin, who was married to the respondent, George Bowdoin ("Mr. Bowdoin"), died in Pasco County, Florida on June 19, 2008. Mr. and Mrs. Bowdoin had one daughter, B., who was twelve at the time this case was tried. B. resides with her father, Mr. Bowdoin.

At the time of Mrs. Bowdoin's death, she was estranged from her husband, having filed for divorce on May 12, 2008. Mrs. Bowdoin allegedly was developing a relationship with another man and was looking forward to pursuing a new life. Unfortunately, and unexpectedly, Mr. Bowdoin found Mrs. Bowdoin dead in the marital home on the morning of June 19, 2008. No suicide note was found, and the cause of death was not immediately apparent.

Ms. Rinnier argues that the police did not immediately investigate the circumstances of Mrs. Bowdoin's death or examine the scene. Ms. Rinnier suggests, in fact, that the police never adequately investigated this case. An autopsy, however, was performed on June 20, 2008, by the District Six Medical Examiner for Pasco and Pinnellas Counties, Florida.[1] The Pinnellas County Forensic Laboratory also analyzed blood and tissue samples taken during the autopsy.[2] The autopsy findings were (1) pulmonary edema and congestion, and (2) post-mortem toxicology, finding 930 ng/ml Zolpidem in the blood and negative for ethylene glycol in the blood.[3] The medical examiner concluded that the cause of Mrs. Bowdoin's death was "Zolpidem toxicity."[4] Zolpidem is marketed under a

---

[1] Respondent's Trial Exhibit ("RX") 2.

[2] RX 3

[3] RX 2. Ethylene glycol is the primary ingredient in automotive antifreeze. *See* "Ethylene Glycol: Systemic Agent" *available at* http://www.cdc.gov/NIOSH/ershdb/EmergencyResponseCard_29750031.html (last visited Nov. 20, 2015).

[4] RX 2 at 1.

number of different brand names, including Ambien. The medical examiner concluded the manner of death was "Undetermined." That is, the medical examiner could not conclude from the autopsy whether the death was accidental or intentional.[5]

Concerning the exterior of the body, the medical examiner found no visible scar or injury on the neck and no visible injury to the chest.[6] Mrs. Bowdoin's chest cavity was normal, with the ribs, clavicles, and sternum intact.[7] The pleural (lung) and abdominal cavities were normal, with no excess blood, fluid, or exudate.[8] The pericardium (membrane enclosing the heart) was intact and contained a minimal amount of yellow serous fluid.[9] Concerning Mrs. Bowdoin's neck, her strap muscles were free of injury, and the thyroid cartilage and hyoid bone were intact.[10] There was nothing notable reported about the liver.[11] The right and left lungs were 570 and 510 grams, respectively.[12] The parenchyma of the lungs was congested.[13] The bronchi were intact.[14] The pulmonary arteries were intact and free of

---

[5] *See e.g.*, Trial Transcript (hereinafter "Tr.") Vol. II at 5-6 (Dr. Manion) (explaining the difference between "manner of death" and "cause of death").
[6] RX 2 at 2.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] RX 2 at 3.
[13] *Id.*
[14] *Id.*

thromboemboli (blood clots).[15]  The skull, brain, and spinal cord appeared normal and free of injury, with no hemorrhage.[16]

After the autopsy, Mrs. Bowdoin's body was embalmed and interred at Gracelawn Memorial Park Cemetery ("Gracelawn") in New Castle, Delaware on June 27, 2008.  The results of the autopsy and laboratory results were not available to Ms. Rinnier before Mrs. Bowdoin's body was buried.  Even before she received the autopsy results, however, Ms. Rinnier suspected that Mrs. Bowdoin's death was not accidental, claiming that statements Mr. Bowdoin made – particularly after the divorce filing – suggested that he was jealous and angry about the divorce and Mrs. Bowdoin's interest in pursuing a relationship with another man.  Ms. Rinnier also believed the Pasco County Sheriff's Office, which investigated Mrs. Bowdoin's death, did not conduct a sufficiently thorough investigation, in part because they did not immediately treat Mrs. Bowdoin's house as a possible crime scene.  Ms. Rinnier also was suspicious of Mr. Bowdoin because he was the beneficiary of Mrs. Bowdoin's $1.2 million life insurance policy, as well as her retirement account and other property.  Finally, Ms. Rinnier was surprised by, and suspicious of, the fact that Zolpidem was found in Mrs. Bowdoin's system,

---

[15] *Id.*
[16] *Id.*

because she did not have a prescription for that medication, although Mr. Bowdoin had been prescribed Ambien.

Ms. Rinnier initiated this action on May 11, 2011 with a Petition for Removal of a Corpse (the "Petition"). Although Gracelawn was named as a defendant in the Petition, the parties stipulated to Gracelawn's dismissal on the condition that Gracelawn agree to abide by any decision of the Court regarding the disposition of Mrs. Bowdoin's remains.[17] Upon Mr. Bowdoin's request, the Court appointed a guardian *ad litem* to represent B.'s interests in this action.

This case then proceeded, slowly, through discovery. Until approximately August 2013, Ms. Rinnier was represented by counsel. Her counsel was permitted to withdraw, however, and she has proceeded without counsel since that time. Ms. Rinnier did not vigorously prosecute this case, either when she was represented by counsel, or thereafter. In fairness, however, she was not sitting idly by while this case sat unattended. Rather, Ms. Rinnier undertook a number of efforts in Florida to find answers about her daughter's death. Among other things, Ms. Rinnier hired a private investigator, Michael Peasley, to assist in her efforts to uncover the manner of Mrs. Bowdoin's death. With Mr. Peasley's help, Ms. Rinnier contacted various Florida authorities, including the sheriff's office and the state attorney.[18]

---

[17] Stipulation of Dismissal, Jun. 30, 2011.
[18] Tr. Vol. I at 47-48 (Peasley).

Ms. Rinnier also filed a petition in Florida to be appointed personal representative of her daughter's estate, which was granted in June 2010,[19] as well as a wrongful death action against Mr. Bowdoin.

This case finally proceeded to trial in March 2015. Over the course of the two-day trial, both sides presented expert testimony regarding the key issue in the case: whether a second autopsy of Mrs. Bowdoin's body, performed several years after her death, was likely to produce any new information about the cause or manner of her death. Ms. Rinnier's expert, Dr. William Manion, is a medical examiner in New Jersey. In Dr. Manion's view, the level of Zolpidem in Mrs. Bowdoin's system was above the therapeutic dose, but was not a level typically considered lethal. For that reason, Dr. Manion opined that the Zolpidem in Mrs. Bowdoin's body did not completely explain her death, and it was possible she was suffocated in a manner that did not leave any significant marks on her body.[20] Although he could not say so with absolute certainty, Dr. Manion believes it is possible that a second autopsy might reveal additional information regarding the cause of Mrs. Bowdoin's death.

---

[19] Ms. Rinnier later was removed as personal representative of the estate, a decision that the Florida Court of Appeal affirmed on December 5, 2014. Although Mr. Bowdoin points to this fact and concludes that Ms. Rinnier only is acting "for herself" in this action, he does not directly argue Ms. Rinnier lacks standing to pursue exhumation or a second autopsy.

[20] Tr. Vol. II at 7-8.

Dr. Manion testified there are two types of additional testing that he would like to perform on the body, both of which tests he believes still could be effective 81 months after the body originally was buried. First, Dr. Manion said that he would like to pursue further toxicology to see if Ambien was taken chronically by the decedent or if this was a one-time acute overdose.[21] Second, Dr. Manion testified that he would like to take an x-ray of the hyoid bone and thyroid cartilage to see if there is a hairline fracture, which the medical examiner could have missed.[22] Dr. Manion suggested that, as the Ambien was not prescribed to Mrs. Bowdoin, if toxicology were to reveal chronic ingestion, this could suggest that the decedent was being chronically fed the drug in food or drink without her knowledge.[23] Similarly, damage to the hyoid bone or thyroid cartilage could reveal suffocation or strangling. Dr. Manion admitted, however, that if the decedent was greatly impaired, it may have been possible to gently suffocate her with a pillow, which would not damage these structures.[24]

In his testimony, Dr. Manion drew several inferences from the report of the initial autopsy as support for his conclusion that a second autopsy might reveal additional information regarding Mrs. Bowdoin's death. For example, Dr. Manion

---

[21] *Id.* at 6.
[22] *Id.* at 8.
[23] *Id.* at 7.
[24] *Id.* at 8.

concluded that, because the medical examiner found the manner of death to be "undetermined," the medical examiner likely believed that investigation of the scene, as well as other police work, was necessary to reach a conclusion regarding the manner of death.[25] Dr. Manion also noted that the autopsy report did not specifically indicate whether the hyoid bone was removed, and testified that, if the hyoid bone was not removed, an examination of it and the surrounding areas might reveal Mrs. Bowdoin was murdered.

Dr. Manion described what he viewed as several suspicious circumstances surrounding Mrs. Bowdoin's death. First, Ambien was not prescribed to Mrs. Bowdoin.[26] Second, there were no pills in her stomach as would indicate a sudden, massive overdose.[27] Third, while Dr. Manion agreed that the Zolpidem level was "high" and "certainly above the therapeutic level," he opined that it was much lower than what usually is seen when a person dies from Zolpidem overdose.[28] He further testified that even where Zolpidem is lethal, there is usually alcohol or a secondary drug present in the system.[29] He explained that Zolpidem is a respiratory depressant (as is alcohol, for example), and what typically is seen is another respiratory depressant acting synergistically with the Zolpidem to cause

---

[25] *Id.* at 6.
[26] Tr. Vol. II at 7.
[27] *Id*. at 7.
[28] *Id*.
[29] *Id*.

respiratory system failure.[30]  Given these circumstances, Dr. Manion suggested someone caused Mrs. Bowdoin to unknowingly ingest the Ambien, which weakened her to the point that she could be suffocated without the perpetrator having to exert much force.[31]

Dr. Manion further testified that, even though Mrs. Bowdoin's body had been interred for 81 months, he still could collect this information from her remains.  He testified that he had examined bodies exhumed five to seven years after burial, and that those remains still could be analyzed because of the fixative properties of embalming fluid.[32]  Dr. Manion could not say, however, whether these bodies previously had been autopsied before the burial.[33]  When pressed on cross-examination, Dr. Manion acknowledged that, after the first autopsy, Mrs. Bowdoin's organs would have been combined in one bag and replaced in her body.[34]  He nevertheless opined that he would be able to glean valuable information from the organs, in part because the funeral director will have put embalming fluid and a sawdust-like absorbent material inside the bag.[35]

Dr. Manion conceded on cross-examination that several of the findings of the autopsy were consistent with the Respondent's theory of death by suicide or

---

[30] *Id*. at 8.
[31] *Id*. at 8.
[32] Tr. Vol. II at 13.
[33] *Id*. at 30-32.
[34] *Id*. at 14.
[35] *Id*. at 14-15.

accidental overdose due to Ambien. For example, the lungs were swollen with fluid, indicating heart failure, which Dr. Manion confirmed is "a telltale sign of drug overdose."[36] Dr. Manion pointed out, however, that there also usually is froth in the trachea and around the mouth in cases of overdose, and no froth was observed in the instant case.[37] Similarly, Dr. Manion confirmed that there was no petechial hemorrhaging as would be consistent with a quick death due to suffocation.[38] Dr. Manion argued that this evidence still is consistent with his theory that the decedent was suffocated gently after already being in a compromised state due to the Ambien.[39] Dr. Manion suggested that Mrs. Bowdoin may very well have been in a state of overdose, "but not necessarily lethal overdose," when someone caused her death by suffocation.[40]

Dr. Manion's conclusions regarding the level of Zolpidem in Mrs. Bowdoin's body, and whether she ingested a lethal dose, were based upon a report authored by Dr. O'Malley, a toxicologist with whom Ms. Rinnier corresponded after Mrs. Bowdoin's death, as well as on Dr. Manion's internet research.[41] From that information, Dr. Manion concluded that the level of Zolpidem in Mrs.

---

[36] *Id*. at 16-17.
[37] *Id*. at 17-18.
[38] Tr. Vol. II at 18.
[39] *Id*. at 18-19.
[40] *Id*.
[41] Tr. Vol. I at 45, 65-66 (Peasley); Tr. Vol. II at 24-25 (Manion).

Bowdoin's body was "consistent with overdose" but "not consistent with lethal overdose."[42]

In response to Dr. Manion's testimony, Mr. Bowdoin offered the testimony and an affidavit[43] of Dr. William R. Anderson, a Florida physician who, among other things, performs private autopsies. Dr. Anderson disputed the bulk of Dr. Manion's conclusions, particularly regarding whether (1) the Zolpidem in Mrs. Bowdoin's system was a lethal dose, (2) there was any evidence to suggest that additional testing of Mrs. Bowdoin's body might reveal that she was strangled or suffocated, and (3) an exhumation and second autopsy of Mrs. Bowdoin's body was likely to reveal any additional information about the cause or manner of her death, given the time that had elapsed since her death.

Specifically, as to the level of Zolpidem in Mrs. Bowdoin's system, Dr. Anderson disputed Dr. Manion's conclusion that the level was not consistent with what typically is a lethal dose. Dr. Anderson cited a recent FDA report that found that Zolpidem has a greater effect on women than on men.[44] He also testified that the level of Zolpidem in Mrs. Bowdoin's bloodstream was three times the

---

[42] Tr. Vol. II at 26.

[43] I allowed Mr. Bowdoin to submit a post-trial affidavit from Dr. Anderson, responding to opinions offered by Dr. Manion, because Dr. Manion unexpectedly was not available to testify on the first day of trial and had not offered a written report, so Dr. Anderson could not adequately respond to Dr. Manion's opinions during trial. Tr. Vol. I at 26-27.

[44] Tr. Vol. I at 110.

therapeutic level.[45] Concerning metabolites of a particular drug, Dr. Anderson confirmed that these can be detected in the blood as well as in liver tissue; he also testified, however, that the deterioration of the tissue several years after burial "would tend to make results of a liver analysis questionable at this point."[46] Dr. Anderson argued that the absence of pills in the stomach tends to suggest that Mrs. Bowdoin had ingested the pills over several hours, suggesting accidental death rather than suicide.[47] Dr. Anderson concluded that the findings "are consistent with an accidental intoxication from Zolpidem at levels now recognized to be potentially dangerous in a female patient" and that "it is highly unlikely that any further information would be elicited by further examination of the body."[48]

Dr. Anderson further disputed any notion that Mrs. Bowdoin was strangled or suffocated, testifying that the first autopsy showed that her lungs were swollen with fluid, indicating that death took place over time, "15, 20 minutes or more, maybe even several hours," rather than suddenly.[49] Dr. Anderson testified that there would not be edema in the case of strangulation or suffocation because death would be almost instantaneous, which would not allow time for the lungs to fill

---

[45] *Id*. at 112.
[46] Anderson Aff., Resp't's Answering Post-Tr. Br. Ex C.
[47] *Id.*
[48] *Id.*
[49] Tr. Vol. I. at 114.

with fluid.[50]   He further pointed to the lack of petechial hemorrhaging in Mrs. Bowdoin's case as evidence she was not strangled or suffocated, although he conceded that petechial hemorrhaging does not occur in all such cases.[51]   In light of all the evidence obtained through the first autopsy, including the absence of any trauma to Mrs. Bowdoin's neck, lips, or nose, Dr. Anderson stressed that the "full picture" did not suggest strangulation or suffocation of Mrs. Bowdoin.[52]   On cross-examination, Dr. Anderson again explained that Mrs. Bowdoin would not have died if a blanket or pillow were simply placed over her face.  According to Dr. Anderson, a suffocation death would have required positive pressure being applied to obstruct the airway, which would have caused death over a matter of minutes, or less, and which would not have resulted in the pulmonary edema observed in Mrs. Bowdoin's body during the first autopsy.[53]

Dr. Anderson opined that there would be "no advantage"[54] to conducting a second autopsy, both because a complete autopsy previously was performed and because of the amount of time that had elapsed since Mrs. Bowdoin's death.  When asked if the first autopsy was complete, Dr. Anderson alternately called it "very

---

[50] *Id*. at 114-15; 126.
[51] *Id*. at 116.
[52] *Id*. at 116-17.
[53] *Id*. at 124-25.
[54] *Id*. at 121-22.

complete" and "reasonably complete."[55]   Dr. Anderson's only small criticism of the autopsy was that he might have taken microscopic sections of some of the tissues, which might have revealed, for example, mild hemorrhaging or signs of pneumonia—the latter of which would have provided an alternative explanation for the swelling of the decedent's lungs.[56]   Dr. Anderson, however, made clear that he did not think that a failure to take additional microscopic sections rendered the autopsy incomplete and added that it would not be unusual for a forensic pathologist not to do these additional tests.[57]

When asked about the possibility of x-raying the hyoid bone, Dr. Anderson testified that it would not be necessary because relevant damage would be apparent from removing the bone and visually examining it, which Dr. Anderson concluded must have been done by the medical examiner.[58]   When pressed by Ms. Rinnier to explain how he knows from the report that the hyoid bone actually was removed, Dr. Anderson pointed to the statement in the report that "the thyroid cartilage bones are intact" and concluded that the only way that the pathologist could know

---

[55] Tr. Vol. I. at 118.

[56] *Id*. at 118; 141.

[57] *Id*. at 118 ("I would have liked to have seen them take some micros, but I'm a surgical pathologist as well.  And so some of the forensic pathologists don't take microscopic sections"). Regarding the thoroughness of the autopsy, there was testimony at trial from Mr. Pellan (director of investigations at the district medical examiner's office where the autopsy on the decedent was performed) that even if foul play had been suspected there would not have been anything that they would have done differently, with the possible exception of saving an additional tube of blood for DNA analysis by law enforcement.  Tr. Vol. I at 97-98.

[58] Tr. Vol. I. at 126-27.

this is if she performed a full dissection, which would, as a matter of course, include a visual inspection of the removed hyoid.[59] In his post-trial affidavit, Dr. Anderson further clarified that it is clear from the autopsy report that no trauma to the head or neck was identified after a complete dissection of the area, "including the laryngeal cartilages as well as the epiglottis—which can only be visualized upon removal of these organs from the body."[60] Dr. Anderson therefore disagreed with Ms. Rinnier's suggestion that the neck structures were not removed but only felt during the autopsy.[61]

Dr. Anderson testified that he has autopsied a number of exhumed bodies.[62] When questioned about the usefulness of a second autopsy several years after burial, Dr. Anderson testified that he could see "no advantage" to doing a second autopsy under the circumstances.[63] He opined that the bag of organs would be decomposed to the point of not being helpful, and the hyoid bone might not even still be with the body, as it sometimes is removed and kept by the medical examiner.[64] Dr. Anderson testified that the only thing that might still be determined from a body this long after death is whether there was some sort of

---

[59] *Id*. at 128-29.
[60] Anderson Post-Trial Aff. at 1.
[61] *Id.*
[62] Tr. Vol. I. at 122.
[63] *Id*. at 121.
[64] *Id*. at 122.

trauma.[65]  In Dr. Anderson's opinion, however, it would not be reasonable to look for trauma at this stage as (1) the body already had been subjected to a thorough autopsy that should have revealed trauma significant enough to cause death, and (2) death by trauma would have been sudden, which is not consistent with the signs of slow death observed in Mrs. Bowdoin's body.[66]

At the conclusion of trial, the parties and the guardian *ad litem* submitted post-trial briefing.  Much of Ms. Rinnier's post-trial submissions strayed into areas I previously concluded were not relevant to the questions before the Court and which I therefore excluded from trial.  Mr. Bowdoin moved to strike those portions of Ms. Rinnier's briefs and associated attachments.  This post-trial report addresses the motions to strike, as well as Mr. Bowdoin's laches defense and Ms. Rinnier's entitlement to the relief she seeks.

## ANALYSIS

### A. Ms. Rinnier's petition is not barred by the doctrine of laches.

Mr. Bowdoin first argues that Ms. Rinnier's petition to exhume Mrs. Bowdoin's body in order to perform a second autopsy is barred by the doctrine of laches, both because she delayed unreasonably before filing this action and because she failed to prosecute this action vigorously even after it was filed.  In

---

[65] *Id*. at 121.
[66] *Id*. at 121, 124.

response, Ms. Rinnier argues that her delay in filing this action is attributable to miscommunication or misunderstandings she had with various authorities in Florida, who caused Ms. Rinnier to believe for a period of time that she did not need a court order to exhume Mrs. Bowdoin's body. Ms. Rinnier also explains that the delay in prosecuting this action was partially a result of her status as a self-represented litigant.

The defense of laches arises from the equitable maxim that "equity aids the vigilant, not those who slumber on their rights."[67] Laches is similar to, but distinct from, the statutes of limitation that bar legal claims; although statutes of limitation do not strictly apply to equitable claims, an action in equity ordinarily is not barred by laches before the analogous statute of limitations has run, but typically will be barred after that time.[68] Despite the similarities, a court of equity presented with a laches defense considers, in addition to the analogous limitations period, whether a party has acted with conscience, good faith, and reasonable diligence.[69] A party asserting a defense of laches must establish three things: (1) the claimant had

---

[67] *Reid v. Spazio*, 970 A.2d 176, 182 (Del. 2009) (quoting 2 Pomeroy's Equity Jurisprudence §§ 418, 419 (5th ed. 1941)).
[68] *Wright v. Scotton*, 121 A. 69, 72-73 (Del. 1923).
[69] *Reid*, 970 A.2d at 183.

knowledge of the claim, (2) the claimant delayed unreasonably in pursuing the claim, and (3) the delay caused prejudice to the defendant.[70]

Mr. Bowdoin does not directly address the first two elements of laches, except to argue that Ms. Rinnier had knowledge of the alleged need for a second autopsy no later than December 2008 or January 2009, but delayed filing this action until May 2011 and then did not seek expedited relief or diligently prosecute her claims. The facts of record, however, indicate Ms. Rinnier was advised, incorrectly, by various Florida officials, that she would be able to obtain a second autopsy if she were appointed personal representative of Mrs. Bowdoin's estate. When she discovered that was not accurate, she retained counsel and pursued this action. Mr. Bowdoin has not shown Ms. Rinnier delayed unreasonably in filing this claim. Although this case ideally would have been resolved much more promptly, I cannot conclude that Ms. Rinnier delayed unreasonably. The difficulties she faced, including pursuing much of this action without counsel, must be acknowledged and taken into account. I cannot conclude Ms. Rinnier did not act in good faith or diligently.

Perhaps most critically, however, Mr. Bowdoin offers little to support his claim of prejudice other than the boilerplate assertion that the prejudice caused by

---

[70] *Id.* at 182-83. *Accord Fike v. Ruger*, 752 A.2d 112, 113 (Del. 2000). *See also Hudak v. Procek*, 806 A.2d 140, 154 (Del. 2002) ("burden to prove the elements of laches – both delay and prejudice to the defendants – rests upon the defendants.").

Ms. Rinnier's delay was "clear," because Mrs. Bowdoin's internal organs "have long-since putrefied" and "[t]he condition of any other bodily remnants is speculative at best."[71] A defense of laches will not prevail in the absence of a showing of specific prejudice or a detrimental change in position arising from the delay.[72] For example, the unavailability of key witnesses, or a loss of other critical evidence, may support a finding that a defendant was prejudiced by a claimant's unreasonable delay. Although Mr. Bowdoin may well be correct in his assessment of the state of Mrs. Bowdoin's remains, he has not explained, let alone shown, how that prejudices his position. To the contrary, if Ms. Rinnier's theory is accurate, the passage of time makes it even less likely that a second autopsy would reveal evidence implicating Mr. Bowdoin in the death of Mrs. Bowdoin. In short, because Mr. Bowdoin has not established any of the three necessary elements, I recommend that the Court conclude Ms. Rinnier's claim is not barred by laches.

### B. Ms. Rinnier has not met the standard necessary to justify an autopsy after burial

Although there are almost no published cases in Delaware addressing the issue, it appears relatively well settled that this Court's equitable powers include the power to order disinterment of a body so a second autopsy may be performed. Under early English law, the ecclesiastical courts had exclusive jurisdiction over

---

[71] Resp't's Answering Post-Tr. Br. at 18.
[72] *Nationwide Mut. Ins. Co. v. Starr*, 575 A.2d 1083, 1089 (Del. 1990).

the dead, including applications to exhume a body.[73] In this country, the law developed so that jurisdiction over such actions lies with courts with equitable powers.[74] Although I could not find any Delaware decisions addressing jurisdiction over an action to exhume a body for purposes of autopsy, this Court has express statutory jurisdiction over actions to disinter and reinter a body arising under other circumstances.[75]

In the only Delaware Supreme Court case addressing the standard applicable to an action to disinter a body in order to perform an autopsy, that court expressly adopted the standard announced by the Fourth Circuit Court of Appeals in *McCulloch v. Mutual Life Ins. Co. of New York*.[76] In *McCulloch*, the Fourth Circuit explained:

> While it is difficult to lay down a rule generally applicable under all circumstances, it is safe to say that two conditions must concur to justify an autopsy after burial. It must appear that through no fault of the [claimant] it was impracticable to demand and perform the autopsy before interment, and secondly, it must be reasonably certain that an examination of the body will reveal something bearing on the rights of the parties which could not otherwise be discovered.[77]

---

[73] *See Petition of Sheffield Farms Co.*, 126 A.2d 886, 555 (N.J. 1956) (citing authorities).

[74] *Id*. at 555-56.

[75] 12 *Del. C.* § 264(c). *See also In re Estate of Necastro*, 1990 WL 105620, at *3-7 (Del. Ch. July 25, 1990).

[76] 109 F.2d 866 (4th Cir. 1940) (cited with approval in *Equitable Life Assur. Soc. of U.S. v. Young & Revel, Inc.*, 250 A.2d 509, 510 (Del. 1969)).

[77] *McCulloch*, 109 F.2d at 869-70.

The cases that follow the *McCulloch* standard apply it strictly, such that only the "rarest of cases" will justify "reaching into the grave in search of 'the facts.'"[78] Although one reasonably might ask what the harm in ordering disinterment and autopsy might be, the standard to take such action is high because the search for "the truth" cannot overlook issues of religion, the decedent's wishes, the effect on loved ones, or the public interest.[79]

Ms. Rinnier has met the first element of the *McCulloch* standard, because she could not foresee the need for the second autopsy before Mrs. Bowdoin was buried. Although the first autopsy was performed shortly after Mrs. Bowdoin's death, the medical examiner's report was not issued until September 12, 2008, two and a half months after Mrs. Bowdoin was buried. Until that time, Ms. Rinnier could not be expected to know what conclusions the medical examiner would reach, or that the manner of Mrs. Bowdoin's death would be ruled "undetermined."

Ms. Rinnier has not, however, demonstrated with reasonable certainty that a second autopsy of Mrs. Bowdoin's remains will reveal information about how she died. In view of the respect typically afforded to a decedent's remains and their resting place, this Court should not disturb those remains unless it reasonably is certain that doing so is likely to be a fruitful exercise. Although I genuinely

---

[78] *Petition of Sheffield Farms Co.*, 126 A.2d 886, 891 (N.J. 1956) (cited with approval in *Equitable Life Assur. Soc. of U.S. v. Young & Revel, Inc.*, 250 A.2d 509, 510 (Del. 1969)).
[79] *Sheffield*, 126 A.2d at 891.

sympathize with Ms. Rinnier's grief, and her desire to learn the reason for her daughter's death, personal sympathies cannot be the determining factor in a petition to disinter bodily remains and subject them to autopsy.

Although Ms. Rinnier's suspicions regarding the circumstances and timing of her daughter's death are understandable, she has presented no evidence – other than motive – to cast suspicion on Mr. Bowdoin. More fundamentally, she has not shown that an autopsy of Mrs. Bowdoin's remains, seven years after her death, is reasonably certain to lead to new evidence regarding the manner of death. At most, Mrs. Bowdoin has shown, through Dr. Manion's testimony, that there are unanswered questions regarding how Mrs. Bowdoin ingested Zolpidem and whether that substance alone could have caused her death. Dr. Manion's testimony did not convince me that the additional tests he would perform during a second autopsy were likely – as opposed to simply possible – to add material information to the record regarding how Mrs. Bowdoin died and whether she might have been murdered. Although Dr. Manion theorized that further testing might show Mrs. Bowdoin chronically ingested Zolpidem, such a finding could not reasonably support a conclusion that Mr. Bowdoin repeatedly "fed" Mrs. Bowdoin the drug without her knowledge; it is at least equally possible that – if tests showed chronic use of the drug – Mrs. Bowdoin repeatedly and voluntarily took the sleep aid that had not been prescribed, but to which she had access. Similarly, Dr. Manion's

testimony about wanting to examine the hyoid bone cannot overcome Dr. Anderson's convincing testimony that the autopsy report shows the medical examiner examined the hyoid bone during the first autopsy.

Moreover, Dr. Manion's testimony was unconvincing regarding the likelihood he would be able to perform those tests eight years after a body was autopsied. Although Dr. Manion has autopsied remains several years after death, none of those autopsies were conducted on bodies that previously were autopsied. Dr. Anderson explained that the autopsy, and the manner in which the remains are reassembled after the autopsy, in addition to the passage of time, likely destroyed any useable tissue or contaminated the remains to the point that any test results would be unreliable.

At its core, Ms. Rinnier's request would require this Court to second guess the processes and decisions of the medical examiner who conducted the first autopsy. None of the witnesses testified that the medical examiner failed to perform an acceptable or reliable autopsy. There is nothing in the record that suggests the medical examiner was motivated to reach any particular conclusion. Ms. Rinnier has not cited, and my own research has not revealed, any case in which a court has ordered a second autopsy after burial. All the cases the parties cite involve requests for a first autopsy. In my view, the standard in a case involving a request for a second autopsy should be even stricter, and should require

the claimant to come forward with some compelling evidence that renders the first autopsy unreliable or demonstrably incomplete. Whether applying that standard, or the *McCulloch* standard, Ms. Rinnier has not met her burden of proof.

### C. Motions to Strike

Finally, Mr. Bowdoin filed motions to strike large portions of both Ms. Rinnier's post-trial briefs. Mr. Bowdoin contends that Ms. Rinnier's briefs referred to, and attached exhibits referring to or containing, evidence that either (1) was not admitted during trial, or (2) specifically was excluded from trial on the basis of relevance. In addition, Mr. Bowdoin contends that Ms. Rinnier made accusations about Mr. Bowdoin, and attached photographs from an unknown source, that are both scandalous and immaterial.

Mr. Bowdoin is correct that Ms. Rinnier's briefs and the exhibits thereto repeatedly reference information that was not admitted into evidence at trial. To the extent she has done so, I have not considered that evidence in making my recommendation to the Court. In view of Ms. Rinnier's status as a self-represented litigant, however, I do not believe it is fair to strike her post-trial briefs. Although many of the exhibits she attached to her briefs were not admitted into evidence at trial, most consist of pleadings or other materials of which this Court may take judicial notice. I do, however, believe that Exhibits B, C, and D(10) to Ms. Rinnier's opening post-trial brief should be stricken from the record as an improper

attempt to admit evidence after trial. Those exhibits consist of two affidavits, one from a fact witness who did not testify at trial and one from Dr. Manion, along with photographs Ms. Rinnier contends are of Mr. Bowdoin and an expensive boat he purchased after Mrs. Bowdoin's death.

## CONCLUSION

For the foregoing reasons, I recommend that the Court deny Ms. Rinnier's petition for removal of a corpse. I also recommend that the Court grant Mr. Bowdoin's motion to strike Exhibits B, C, and D(10) to Ms. Rinnier's first post-trial brief, but that the Court otherwise deny Mr. Bowdoin's motions to strike. This is my final report and exceptions may be taken in accordance with Rule 144.

Sincerely,

/s/ *Abigail M. LeGrow*
Master in Chancery

cc: Michael D. Fluke, Esquire